## G. Ferrari, Appellant, vs. The Board of Health of Escambia County, Appellee.

1. The quarantine act of 1885, taken by itself alone, does not, by virtue of the general powers it confers on County Boards of Health, authorize charges to be made against a vessel for quarantine purposes.

2. Where several acts are in *pari materia*, being on the same subject, and having in view one object, they should be construed together as one system, although containing no reference to each other.

3. The County Boards of Health, under the act of 1885, construing that act in connection with the quarantine acts of 1879 and 1883, are authorized to make charges against a vessel for quarantine services, if under the authority given by the latter act they have made proper provision therefor.

4. A reasonable charge according to tonnage of the material for the use of a crib erected by the Board for receiving ballast, is proper where the discharge of the ballast is for the purpose of disinfection, but it is not proper to base any charge on the tonnage of the vessel.

5. A contract made under duress cannot be enforced, but if bad only for that cause, it is voidable, and if ratified after the duress has ceased, it becomes valid and enforceable.

*Blount & Blount* for Appellant.

The plaintiff sues upon a dishonored order in writing drawn by the defendant in favor of its Secretary and Treasurer. The defendant, withdrawing all other pleas, pleads only one—want of consideration and duress in compelling the giving of the order, (page 16 of the record.) The plaintiff replies, taking issue upon the allegation of duress, (page 19 of record.) To this replication the defendant demurred. The court below overruled the demurrer, and the defendant refusing to plead over, judgment was entered against him.

JUNE TERM, 1888.          391

G. Ferrari v. Board of Health, Escambia Co.—Argument of Counsel.

The replication being a traverse of only a part of the plea, the question raised by the demurrer to it is as to whether such part traversed was a material part, or in other words, whether the plea, omitting the part traversed, was a good defense to the action.    Appellant submits that it was.

The plea was that the order was without consideration, and was given only because of duress.    The traverse was only of the allegation of duress, so that the court has only to consider whether there was a sufficient plea of want of consideration.

The absence of a denial by the plaintiff that the defendant did not request, or consent to, the rendition of the services, and that they were forced upon him, is an admission of those facts, and the only remaining inquiry is whether the plaintiff could, without the request of the defendant, not only render services to him, but compel him to accept them and then require him to pay for them.

Obviously, if the contest was between individuals, the statement of the proposition would be its answer.    For, services rendered without an express or implied request, can furnish no foundation for an action.    Bartholomew vs. Jackson, 20 Johns, 29 ; Authorities, *infra*.

The existence of an express request is negatived in terms here, and the implication of a request which might arise from an acquiescence in the rendition of the services, (2 Greenleaf on Evidence, p. 108), is also negatived by the allegation that the compulsion of the law exerted by the plaintiff was used to secure acquiescence.    Some right, then, in the plaintiff, other than that which would appertain to it as an individual, must be found in order to authorize a recovery here, and it seeks to find that right in the fact that it is in some sort the representative of the sovereignty of the State, and therefore authorized not only

to compel vessels to submit to processes necessary for purposes of quarantine, but also to compel them to pay therefor.

This contention of plaintiff is based upon the case of Morgan vs. Louisiana, 118 U. S., and upon kindred decisions. Since these decisions, we cannot doubt the power of the State, without violation of the United States Constitution, to authorize the exaction by a Board of Health of fees from vessels for services performed by it for quarantine purposes. But these decisions decide only upon the power of the State, and do not decide that Boards of Health may exercise, without special authority, from the State, such power, and we deny that the Legislature of the State of Florida has ever given any such authorization to the County Boards of Health. This is a body with special statutory powers, and it has no power except that which is expressly or by necessary implication given to it. Brenninger vs. Belvidere, 44 N. J., 350; Spring vs. Hyde Park, 137 Mass., 559. Especially is that true when the power sought to be exercised is the power of taxation. M. E. Church, *in re.*, 66 N. Y., 395; Dillon on Municp. Corp., Sec. 763, (605.)

We do not ignore the dictum of the Supreme Court of the United States (in Morgan vs. Louisiana, 118 U. S.,) that the exaction is not a tax, but the dictum was *obiter*, and we submit that it is not sustained by reason or authority.

See full definitions and citations in 1 Desty on Taxation, p. 100. While this may not be a general tax, yet it is a special tax in the nature of an assessment upon particular property for its benefit and the benefit of interests affected by it. 1 Desty on Tax., p. 3. In either case the power to impose it must be unequivocally conferred expressly or by

JUNE TERM, 1888.                     393

G. Ferrari v. Board of Health, Escambia Co.—Argument of Counsel.

necessary implication.   Wright vs. Chicago, 20 Ill., 252 ;
5 Rich, (S. C.,) 550 ; 32 Md., 471.

But if not a tax yet it is a compulsory exaction—the ser-
vice is not sought, but is enforced and a payment therefor
is compelled.   While in some sort these may be in part
compensation for the money extorted, yet that compensa-
tion is forced upon the vessel, the right of the property
owner to dispose of his property or money in accordance
with his own will is invaded, and while the Legislature
for the common good might exercise such a power, and
might delegate it, yet it is not to be tolerated that an in-
ferior function of the government should  exercise such
power without a clear delegation to it.

There has been no such delegation.   The existence of
the Board of Health is derived from Chapter 3603, laws of
1885 ; and all its powers are to be found therein.

That act will be searched in vain for any  express power
to collect a revenue in any way, and there is no necessarily
implied power.   On the contrary a provision for a revenue
to be raised by entirely different means is made by a resort
to the taxing power residing in the County Commissioners,
p. 6.   Not only is there, then, no neccessity for the impli-
cation of such a power in the board, but a clear prohibition
of such power by the application of the maxim  " *expressio
unius*," etc.   But it is said that even though the exaction
was not legal, and the plaintiff could not have recovered
for the services performed, yet that the defendant has
promised to pay for them, and that the services received,
although payment therefor could not have been compelled,
make a consideration for the express promise.

This contention ignores the law, for the law is that ser-
vices voluntarily rendered in the past, unless accepted
when a refusal was open to the acceptor, (Hare on Con-

tracts, 241,) or services compulsorily rendered, furnish no consideration for a promise to pay for them. Dodge vs. Adams, 19 Pick., 429 ; Hare on Contracts, 241 ; 102 Mass., 450 ; Jeremy vs. Goodman, 1 Cro. Eliz., 442.

In short, the promise is of no efficacy. The efficacy lies in the request, and there must be proof of the request, either express or implied, from the ordering of the performance, or the acceptance of it, when the acceptor was free to refuse. Hare on Contracts, 241 ; 3 Pick., 207.

The plea negatives a request of any kind. If there was no obligation when the promise was made there was nothing for the promise to stand on. If the nature of the transaction is such as to give rise to an obligation the law will imply a promise to fulfil it ; if it is not, a subsequent promise will not create a liability which was wanting in the first instance.

So that the rendition of the services under the circumstances furnished in itself no foundation for an action, and no consideration for the promise, and therefore the promise was of no force, whether it were or not given under duress. The replication, then, traversed an immaterial allegation and was demurrable, and the court erred in overruling the demurrer.

Appellee contends that the compulsion upon the vessel to receive and submit to the services was compulsion of law, and therefore there was no such compulsion as to justify appellant in refusing to pay.

But it matters not whether the compulsion was a compulsion of law or not so long as it was compulsion. If, as we admit for the purposes of this case, the Board of Health had authority by law to force upon the appellant the reception of the services for which it claims compensation, then the compulsion was more forceful than if it had not the law behind it. The services could be charged for

only under one of the two conditions—where they were performed at the request, express or implied, of the recipient, or where, being performed without his consent, the law gave authority to charge for them, even though forced upon him.   It is not sufficient for the appellee to show that it had the power, for the protection of the community, to compel a reception of the services, but it must also show a power to charge for them although enforced.

But appllee contends that it was not compulsory because the appellant had the option of abandoning his charter and of proceeding to sea.   But the privileges of commerce and the navigation of the harbor of Pensacola are free.   True, it is to be exercised under the valid regulations of the State, made in pursuance of its police power.   This gave the right to compel the reception of the services by the vessel, and if the vessel did not care to submit to them it could refrain from chartering for Pensacola.   But such compulsion would be lawful.   When, however, the choice is given to submit to an unlawful exaction made by an official in connection with the exercise of lawful power, or of abandoning a charter which the vessel had traversed thousands of miles to enter upon, and by such abandonment would subject itself not only to loss of months of time and of much money expended during that time, but also to suits for damages for breach of charter, there can scarcely be said to be any choice at all.   If there is any such choice still the appellee has no right to insist upon it being made, because one of the alternatives was illegal and forced.   Appellee's illustration upon this point is not at all analogous, because B (in his attempted analogy) had no right to go upon A's land, except upon such condition and for such compensation as A might demand.   But the appellant here had the right to go to Pensacola and fulfill his charter free from

any exactions except those which the law had authorized. In going to Pensacola he proceeded over property of which he was one of the owners, and which he could cross freely, subject only to such exactions as the Legislature should permit lawfully to be made upon him.

Morgan vs. Louisiana, 118 U. S., only decides that the Legislature has the power to authorize charges for such services. We only contend here that it has never exercised that power.

The appellee assumes that the direct tax, authorized by the 6th section of the act, is to be resorted to only when other resources fail. Where is there any ground for such assumption? Where in the act is to be found the authority to secure any other resources? There is only one source given, and other sources are but figments of the imagination. It is singular that a given power should be assumed to be supplementary to one not given.

But it is said that the power to acquire real and personal estate is given, and that under section 6 there is no power to raise funds by taxation except to defray the expenses of operation, and therefore the right to get other funds is implied. To this, as applied to this case, there are several answers:

1. That the appellee is not authorized by the act to acquire real and personal property as an investment, but only for the purpose of carrying out efficiently its operation. Unless that operation requires such real and personal property it would have no right to acquire it. So that the acquisition of such property is a part of the expenses of its operation, and funds collected under the 6th section would be available for such acquisition. The purchase of ground upon which to build necessary structures, the buildings of them, the acquisition of boats and other property, would

JUNE TERM, 1888. 397

G. Ferrari v. Board of Health, Escambia Co.—Argument of Counsel.

clearly be as much a part of the expenses of operation as the payment of salaries and other current expenses.

2. But if such acquisition could not be paid for out of the money realized under the 6th section, what authority is there for collecting from vessels that go into quarantine? Why should they be any more legitimate prey than the merchants to whom they are consigned, or the pilots who bring them to quarantine, or the public for whose security they perform quarantine? What greater warrant is there for collection from one class than from the other? The fact that the appellee may need the money does not justify it in singling out the vessels and supplying its needs from their necessities.

3. But if this power exist it is a special power for a special purpose, and when the exercise of that power in any given instance is questioned it must be shown that the special purpose demands its exercises. In this case it will devolve upon the appellee to show that it was necessary for it to acquire real and personal property, and to collect funds to pay for it, or that such property had been acquired and was not paid for, and that therefore the funds were needed. No such showing is made.

*J. C. Avery* for Appellee.

This case comes here on appeal from Escambia county Circuit Court, the only error assigned being the overruling of appellant's demurrer to appellee's replication to last plea —all other pleas having been abandoned by formal entry of record.

The replication demurred to denies a part of the plea, admitting the truth of the parts not denied, with the intendments and implications, however, against the pleaders;

as to those parts. Stephen on Pleading, 379; 1 Chitty's pleading, 545.

Appellant contends that the replication is insufficient because it puts in issue an immaterial allegation of the plea.

The inquiry, then, is, does that part of the plea which remains present a valid defence?

I contend that it does not.

It is claimed in behalf of appellant that there was no consideration for the draft on which the suit was brought, because the services, for which it was intended to pay, were "without request or consent," and were forced upon him.

The plea, taken as whole, and in connection with the rules and regulations of the Board of Health, makes no such defence.

In the first part of the plea it is alleged that the want of consideration was in the fact that "the defendant (appellant) was compelled, without his request or consent, by the plaintiff (appellee), to permit his said vessel to undergo such inspection and fumigation," and, further on, it is alleged that defendant was ordered into quarantine, a place limited in territorial extent, having within it but one place at which ballast might be legally discharged, and that defendant was ordered by the quarantine physician to discharge the said ballast in said quarantine station before proceeding to Pensacola.

These allegations are the gist of appellant's complaint against the board and of his defense to their action, and, if they stood alone, they might accomplish the purpose for which they are pleaded.

But they do not stand alone, and are to be taken and construed with other allegations of the plea, of which the rules and regulations of the Board of Health are part, as Exhibit A of the plea.

JUNE TERM, 1888. 399

G. Ferrari v. Board of Health, Escambia Co.—Argument of Counsel.

We find in the body of the plea " that the said vessel was under charter to load at the city of Pensacola;" also that appellant had the option to refrain from complying with the requirements of the health authorities by abandoning his charter and proceeding to sea; also a voluntary giving by appellant to appellee of the draft upon which the suit was brought for the services received, and without which the charter could not be fulfilled. These allegations, taken in connection with Rules 13, 14 and 15, of Exhibit A of the plea, and the rule of construction of a pleading above recited, enable the court to determine exactly what the defense is, to-wit:

That the appellant, being master of the ship, (and, hence, presumptively the owner of her—Lawson on Presumptive Evidence, 420; Stacy vs. Graham, 3 Duer, 444; Bradley vs. The New World, 2 Cal., 373,) and non-resident of Florida, (see affidavit for attachment in the record,) chartered her to load at the city of Pensacola; that in pursuance of the charter he brought her to the city of Pensacola, and within the jurisdiction of the State, acting in Escambia county through appellee (the Board of Health): that he and his vessel were subject to the rules and regulations (Exhibit A of the plea,) of the Board of Health, (appellee)—Tiedman's Limitations of Police Power, Sec. 204, Morgan vs. Louisiana, 118 U. S., 455—except, as appellant claims, the rules requiring payment for services rendered by, and at the expense of, the Board of Health, and without which the vessel could not legally perform her charter; that appellant and his vessel elected not to abandon the charter and proceed to sea, but to submit to inspection, fumigation and discharge of ballast at appellee's wharf or crib, constructed according to law—McClellan's Digest, pp. 368 and 9; that, accordingly, the vessel was so inspected and fumigated and ballast was so discharged,

and the vessel was released from quarantine and allowed to proceed to the city in accordance with Rule 6 of Exhibit A of the plea; and that, thereupon, and in consideration thereof, the appellant, without any complaint, gave the draft on which the suit is brought.

It seems to me that all of this is admitted by the plea, and the statement refutes the theory of appellant that his draft was without legal consideration.

Appellant's attorney contends in his brief that our replication admits that appellant did not request or consent to the services, and that they were forced upon him. In other words, he claims that the services were received under compulsion.

That admission must not be taken as of certain words and expression in the plea segregated from the rest, but, on the contrary, in their qualified sense when taken in connection with other allegations in the same plea, and the exhibit attached thereto.

The admission, therefore, amounts to this, that the vessel could not perform her charter at Pensacola without submitting to inspection, fumigation and discharge of ballast at quarantine station.

The compulsion, then, was only the compulsion of the law of the port operating on appellant and his vessel, the same as upon others coming into the port between the dates mentioned in rule and regulation 1 of Exhibit A of the plea.

It has never been contended that the compulsion complained of in this case was any other than that exerted in the regular and usual enforcement of said rules and regulations, or that the absence of consent was other than that which flowed from the acceptance of a service not desired but submitted to for the purpose of accomplishing a discharge from quarantine restraint.

I think, taking the plea as a whole, it will appear that such is the essential claim of the plea, and as this appeal is taken to settle a principle, I presume that counsel will not desire to have any other meaning attached to his language.

In this view the compulsion complained of is of the same character as that which constrains men in every relation of society. This compulsion operates to prevent the taking of another's property without paying for it; to compel each to use his own so as not to interfere with the rights of others, to enforce submission to general police restraints, etc., etc.

In a certain sense this is all compulsion, but it is not legal compulsion, because the law conclusively presumes the consent of each individual, to such restraint, as a member of society and participant of the benefit resulting therefrom to society.

The case is in no sense analogous to a contest between individuals, as suggested in brief for appellant. But suppose a controversy between individuals, A. and B., like this: A. wishes to reach a certain point and perform a certain duty or fill a certain contract, but cannot do so without passing over the domains of B., B. has provided a certain means of transportation over his territory and will permit no one to pass in any other way. A. approaches the confines of B.'s possession, complains of the means of transportation and the unreasonableness of B.'s method, but insists upon going through to accomplish his purpose. Thereupon, protesting and complaining, and full of dissatisfaction, he is compelled to accept that which he would like to avoid and against which he protests. Here would be a case of compulsion, in one sense, it is true, but can it be seriously doubted that B. could legally charge for the service?

In the case at bar it has not been, and will not, I appre-

402          SUPREME COURT.

G. Ferrari v. Board of Health, Escambia Co.—Argument of Counsel.

hend, be seriously contended that the rules and regulations requiring an inspection of all vessels coming into the port, and the fumigation of such as the health authorities deem it advisable to fumigate, and the discharge of ballast, where such authorities deem it expedient, within certain limits, where the same can be done under their immediate supervision, are invalid and beyond the jurisdiction of appellee. Sec. 8, Chapter 3603, of the Laws of Florida.

If they are valid then they are the law, and obedience to them is submission to compulsion only in the same way that payment to another for property first acquired by him is submission to compulsion.

The service having been rendered on the one side and the benefit thereof received on the other, under such circumstances, the question arises, had the appellant a right to charge appellee for it?

The same question was very fully considered by the Supreme Court of the United States in Morgan vs. Louisiana, 118 U. S., *supra*, and that court said: "This system of quarantine differs in no essential respect from similar systems in operation in all important sea ports all over the world where commerce and civilization prevails." The same may be said of the system at the port of Pensacola.

The same court says: "Whether these precautions were judicious or not this court cannot inquire. They are part of an inherent in every system of quarantine."

The court further says: "It is obviously to her (the vessel) interest, in the pursuit of her business, that she enter the city and depart from it free from the suspicion which, at certain times, attaches to all vessels coming from the Gulf." "If the law did not make this provision for ascertaining her freedom from infection, it would be compelled to enact more stringent and more expensive penalties against

the vessel herself." * * *. * "For this examination and fumigation you must pay."

The court further declares this "more clearly a fair charge against the vessel than that of half pilotage, when the pilot's services are declined, and where all the pilot has done is to offer himself."

In that case only fumigation and inspection charges were involved; but there can be no difference in principle between such charges and charges for the discharge of ballast, through the instrumentalities of the health authorities in cases where such authorities, in the exercise of the discretion they have under the law, require the discharge of foul, infected or suspicious ballast at a point selected by them as least dangerous to the health of the community, and at which they can secure its complete discharge.

Of course the charge made for the service must be reasonable, and in this case it is not claimed that it is unreasonable. As a fact, it is the usual charge for such service.

The claim is made that the charges are taxes which appellee is not authorized to levy. In the case of Morgan vs. Louisiana, the court distinctly says it is not a tax. See also 16 Fed. Rep., 890, and 105 U. S., 759.

Appellant denies appellee's power to make the charges for which appellant gives his draft in payment, because the act under which appellee exists as a corporation does not in express terms confer it.

Of course I admit that, unless the power is expressly or by implication conferred, the board could not legally exact the charges. The statute nowhere says that the Board of Health acting under it may charge for inspection of vessels or fumigation or discharge of their ballast. But the act does provide that they shall have " power to contract and be contracted with, and to acquire and dispose of at pleas-

ure property, both real and personal, * and to do every other act necessary to the proper exercise of such power." Again it provides that " they shall have full power to act in regard to all matters pertaining to quarantine, public health, vital statistics, and the abatement of nuisances." Again it provides that they may " at any time establish such quarantines as in their judgment is expedient for the public welfare and provide such rules and regulations for the same as may be needful for the proper enforcement of such quarantine."

The Supreme Court of the United States, as we have seen, takes judicial notice of the incidents, rules and power of quarantine authority at all ports, and that they are, in general, (especially in the matter of fees and charges) the same. At one point that court uses this language : " It is said that the charge to the vessel for the officers' service in examining her is not a necessary part of a quarantine system. It has always been held to be a part in all other countries, and in all quarantine stations in the United States." The court might have said that all charges for services rendered at and by quarantine are a part of all such systems.

It is very clear from the terms of the above citations from Chapter 3603, of the laws of Florida, that the Legislature intended to vest the Boards of Health existing under its provision with all the powers usually possessed and exercised by such bodies, and further, that in the exercise of such powers they might contract and be contracted with and acquire property, both real and personal.

The Legislature created these corporations with powers expressed in general terms, but certainly implying those " usually appurtenant." Boone on Corporations, Sec. 36.

Appellant's counsel further contends that section 6 of the said statute, by conferring upon the County Commissioners

power to assess and levy a tax, not to exceed in any year two mills on the dollar, to enable the board to defray the expenses of its operation, is an exclusion of power in the board to raise money in any other way.

I take this as a provision to enable Boards of Health to obtain funds to defray the expenses of their operation, where other resources fail, or where they are not able to secure them in the exercise of the power which the U. S. Supreme Court says is incidental to all systems of quarantine. Taxation of the character in section 6 is unusual, and the power to resort to it is given to enable the boards to supplement funds otherwise acquired. By the letter of this provision the money raised by such taxation can only be used to defray the expenses of the operation of the boards; and yet the 5th section authorizes them to acquire property, both real and personal. How are they to acquire it if their only funds come from taxation by County Commissioners, and such funds can only be applied to defray the expenses of their operation? The law clearly contemplates the acquisition of property by such boards otherwise than by means of funds acquired from the two-mill tax. If it does then the argument of "*unius expresio exclusio alterius est*" fails.

I do not care to press upon the consideration of this court any argument based upon the effect of the voluntary giving of a note or draft to pay for a service accepted under compulsion or duress. Should the court reach that point before deciding this case in behalf of appellee they will have no difficulty in correctly adjudicating the question so as to dispose of this particular case.

Appellant is only fighting for the main principle involved, the solution of which is vital to its power to protect the community from the incursion of disease from the Gulf.

I submit, however, that where a contract is merely void-able, a bill or note to pay it is good.   1 Daniel on Negotiable Instruments, Sec. 182.

A contract made under duress is not void but voidable. 6 Wait's Actions and Defences, 659.

For services accepted and beneficial in their character, such as appellant received from appellee, the law implies a promise to pay.   Even where a corporation is involved and the act is *ultra vires*, though not expressly prohibited, action at law may be sustained.   Boone on Corporations, Sec. 98.

If duress has been used in either case the party subjected to it may avoid the liability.

But if he afterwards gives his bill or note, freely, to discharge the liability, as seen above, such ratification will bind him.

Appeal from the Circuit Court for Escambia county.

The facts of the case are stated in the opinion.

The Chief-Justice delivered the opinion of the court:

Appellant gave a draft directed to E. W. Menifee, requesting him to pay to the order of F. G. Renshaw, at sight, $137.09, for value received.   The draft was endorsed to appellee, and on refusal of Menifee to pay, this action was brought to recover the amount from appellant.   His plea, on which the case turns, is this: " That the said draft was given for fumigation and inspection done to the vessel, of which defendant was master, by the plaintiff, and for the sum of $85 for the discharging of ballast into the crib of the plaintiff, and that there was no consideration for the giving of said draft, for that the defendant was compelled, without his request or consent by the plaintiff,

to permit his said vessel to undergo said inspection and fumigation, and for that the quarantine ground or station under the control of the plaintiff is limited by them in territorial extent; in the said ground or station there is no other crib or place into which, under the laws of Florida, ballast could be discharged; that the defendant was ordered by the plaintiff to go into said quarantine, and was then ordered by the quarantine physician, under the rules of the plaintiff, a copy of which is hereto attached, marked 'A,' and made a part hereof, to discharge the said ballast in the said quarantine station before proceeding to the city of Pensacola; that the said vessel was under charter to load at the city of Pensacola; and under the said order of the said physician, defendant had no option except to discharge his ballast at the said crib, or to proceed to sea without fulfilling his said charter, and therefore he discharged his said ballast at said crib, and upon the refusal of the said quarantine physician to allow the said vessel to proceed to Pensacola, until defendant had given a draft to his consignee for the sum demanded, he gave the draft upon which this suit is brought."

The replication is: " That it is not true that said quarantine physician refused to allow the said vessel to proceed to Pensacola until the said defendant had given a draft to his consignee for the sum demanded."

To this appellant demurred, and the court having overruled the demurrer, judgment was given for appellee.

The question presented on the appeal, is whether the plea contains matter, besides that traversed in the replication, sufficient to constitute a defense to the action. It is a plea of no consideration for the draft, in that the services for which the draft was given, were rendered without the request or consent of appellant, and accepted under compulsion, and he was also in effect under compulsion when he

408 SUPREME COURT.

G. Ferrari v. Board of Health, Escambia Co.—Opinion of Court.

gave the draft to pay for those services. This defence rests upon the well established rule of law, that a contract made under duress is thereby vitiated and may be resisted as invalid. If it is an obligation to pay money, it can not be enforced against objection by the obligor. Appellant claims the benefit of this rule, and is entitled to it, if no other rule intervenes in the case, unless the quarantine laws of the State, and the regulations made under them by the Board of Health of Escambia county, put a face on the matter that renders the rule inapplicable.

The regulations of the board that are involved are the 13th, 14th and 15th. The 13th directs that the " port inspector or quarantine physician shall visit and inspect every vessel entering the bay of Pensacola, and ascertain and report her sanitary condition," and that " the master or owner of any vessel so inspected, shall pay for such service a fee of five dollars." The 14th provides that " vessels in quarantine may be discharged at the crib therein by paying fifty cents per ton for so discharging." The 15th provides that " every vessel cleansed or fumigated at the quarantine station, shall pay for such cleansing and fumigating * * five cents per ton according to the registry of the vessel," &c. It is claimed and admitted that if these charges are not authorized by statute directly, or through power given to the board by statute to make them, they are illegal. Wright vs. Chicago, 20 Ill., 252 ; Corporation of Columbia vs. Hunt, 5 Richardson, Law. R. (S. C.), 550 ; Mayor, &c., of Annapolis vs. Harwood, 32 Md., 471. Counsel for both parties argue this question of authority entirely upon the statute of 1885, Chap. 3603, being " An act to provide for the appointment of Boards of Health in and for the several counties of the State of Florida, and define their powers." There is nothing in this act expressly authorizing the charges complained of. But counsel

for appellee finds authority for the board to make them in some of its general provisions. He refers to section 5, which declares that the board " shall be a corporation with power * * to contract and be contracted with, and to acquire and dispose of at pleasure, property, both real and personal, and to do every other act necessary to the proper exercise of such powers." That such charges could be recovered if the board had a contract with the master or owner of the vessel for the service on which they are founded, will not be denied ; but in the absence of such contract, we think the power given in this section cannot be invoked to justify the charges. Reference is also made to Section 8, which provides that the board " shall have full power to act in regard to all matters pertaining to quarantine, public health, vital statistics, and the abatement of nuisances," &c ; and to section 9, which provides that the board " may at any time establish such quarantines as in their judgment is expedient for the public welfare, and provide such rules and regulations for the same as may be needful for the enforcement of such quarantine," &c. The authority given by these two sections is general in terms, but can it be extended to include the right to demand a tax or other money exaction from those who are made to undergo quarantine? We know of no instance in which a person can be required by a State or any of its subdivisions to pay money for public use unless there is express authority of law for it. An incorporated city or town can not impose a tax, if its charter does not in words warrant it, although it may be invested with general powers that can not be executed without money. Analagous to the general authority to the board, in the sections quoted, is the authority given to cities and towns by the general incorporation act to " pass all laws and ordinances which may be necessary for the preservation of the public health;"

and yet no one will pretend that this power can be of any efficacy if there had not been granted in the same act the additional power to raise money by taxes and licenses for " carrying out the powers and duties granted and imposed " by the act. This is in accordance with a fundamental rule of free governments, that no person shall be disturbed in the full use and enjoyment of his property except for public purposes, and then only by express provision of law. In the light of this rule it is apparent that the act in question does not in itself authorize the charges objected to in the plea.

But there is a wider view of the matter. We have had occasion recently in the case of O'Donovan vs. Wilkins (unreported) to consider questions arising under the quarantine laws of the State, and as there are several acts in force on the subject, we held that they must be construed as acts in *pari materia.* As to this Kent says : " Several acts in *pari materia,* and relating to the same subject, are to be taken together, and compared, in the construction of them, because they are considered as having one object in view, and as acting upon one system." " The rule applies though some of the statutes may have expired, or are not referred to in the other acts. The object of the rule is to ascertain and carry into effect the intention ; and it is to be inferred that a code of statutes relating to one subject was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions." 1 Kent, 463 ; 9 Barbour's Sup. Ct. Repts., 161.

In applying this rule in the case of O'Donovan vs. Wilkins, it was said that " when the act of 1885, in its ninth section, says that a Board of Health created under it may at any time establish such quarantines as in their judgment are expedient, it means quarantines as authorized by the

act of 1879." Again it was said that " the sixth section of the act of 1879 informs us what is meant by the act of 1885, when by its eighth section it gives power to appoint and suitably compensate a Port Inspector." This, however, had more especial reference to the duties of the officer. The section of the act of 1879 which relates to his compensation is the seventeenth, wherein fees for the Inspector and for fumigation are fixed. It reads thus : "Every vessel undergoing inspection by the Port Inspector shall pay therefor to the Board of Health a fee not to exceed five dollars ; and every vessel in quarantine which, in the opinion of the Port Physician, shall require and shall receive fumigation or other disinfection, shall pay therefor to the Board of Health a fee not exceeding five cents per ton and the costs of the disinfectants necessarily used." But that section is amended by the act of 1883, which is as follows: " That Section 17, of Chapter 3162, be and the same is hereby amended so as to read as follows : " All the officers and employees in and about quarantine shall be paid, and the expenses of Quarantine Board, by the city or town establishing such quarantine. Every vessel undergoing inspection by the Port Inspector, and every vessel in quarantine which, in the opinion of the Port Physician, shall require and receive fumigation, or other disinfection, shall pay therefor to the Board of Health such fee or fees as may be prescribed by said Board of Health, and if the master of any ship, boat or vessel shall refuse to pay such fees the Board of Health may detain said vessel in quarantine until the same are paid, or may sue for and recover the same from the owner of such ship or vessel."

This being now a part of the act of 1879, instead of section 17, it is to be taken into consideration under the rule of construction laid down. Considering it as a part of the

quarantine system, and that the several acts are to be con-
strued together, and, in the language of Kent, " considered
as having one object, and as acting upon one system    *    *
governed by one spirit and policy, and intended to be con-
sistent and harmonious in its several parts," it must be
seen that this provision for the payment of employees and
officers and of the expenses of quarantine is of force for the
county board created by the act of 1885 as well as for the
board of a city or town created by the previous act.  There
is a difference between the acts in the constitution of the
boards, but the system of quarantine otherwise, that is, the
work to be done by the boards, must be the same, so far
as regulated by statute, for the later as for the earlier
boards, unless expressly changed.  The general powers of
the act of 1885, therefore, must be construed as being
aided by the more specific provisions of the other acts.

In this view, while the act of 1885 does not specifically
provide for quarantine fees and charges, we may look to
the act of 1883 for authority to the board in that regard.
That act requires that such fee or fees as may be prescribed
by the board of health " shall be paid by every vessel under-
going inspection by the Port Inspector, and by every vessel
in quarantine requiring and receiving fumigation or other
disinfection."  The board, in its 13th regulation, quoted
above, provides a fee of five dollars for the Inspector.  This,
as a fee to be charged for inspection during quarantine, is
legitimate.   So, as to the charge provided for in the 14th
regulation, fifty cents per ton for ballast discharged at the
crib of the board (the tonnage relating, not to the vessel,
but to ballast.)  That is legitimate, if such discharge is
for the purpose of disinfecting the vessel, but not other-
wise.   The act does not contemplate or authorize any
charge, other than for inspection, unless the inspection re-

sults in requiring fumigation or other disinfection. As to fumigation, the 15th regulation of the board provides for a charge of " five cents per ton according to the registry of the vessel." While the board has full authority under the act to make a charge for fumigation, its said regulation cannot be sustained. It is a tonnage tax or a charge measured by tonnage of the vessel which is in violation of the Constitution of the United States. See State Tonnage Cases, 12 Wall., 204; Peete vs. Morgan, 19 Ibid, 581; Cannon vs. New Orleans, 20 Ibid, 577; Inman Steamship Co. vs. Tinker, 94 U. S., 238.

It appears, therefore, that some parts of the consideration for the draft were valid; and such charges, so far as made for compulsory service, are authorized by law, in that the system of quarantine laws established by the statutes of the State is a rightful exercise of the police power for the protection of health, not forbidden by the Constitution of the United States. Morgan Steamship Co. vs. La. Board of Health, 118 U. S., 455.

We do not think the fact that under the act of 1885 the County Commissioners are empowered to raise a tax at the request of the board to defray the expenses of its operation, is to be considered as excluding other and the usual modes of providing means for quarantine purposes. It is more likely that while applying to all counties it was intended to make provision for such of them as are not visited by commercial vessels, as also to aid in starting the system and to supplement any deficiency of means for those that are visited by such vessels. Charges of the character complained of are common under all systems of quarantine for sea port towns. They are " compensation for services rendered, as part of the quaranti e system of all c untries," (118 U. S., supra,) which we cannot believe it was the intention of the Legislature to surrender; and, finding under

the construction we have given the quarantine acts, that the board may make such charges, it seems reasonable to conclude that both resources were meant to be given.

Recurring to the pleadings, we have seen that a most material allegation of the plea is eliminated, and we are now to consider the effect this charge will have in the decision of the case. The replication in effect denies that the draft was given under compulsion, as alleged by the plea. The demurrer to the replication is an admission that there was not this compulsion. So, that though the consideration for the draft may have been invalid, yet under the pleadings it must be treated as given voluntarily. The situation, then, is this: Appellant accepted service of value from appellee, but because he was compelled to. We say of value to him, for the reason that his vessel was under charter to Pensacola, and he could not go there until he had performed quarantine duty. Whether it was illegal to charge him for any service rendered in that duty by those conducting quarantine, is immaterial as to the value of the service which was necessary towards enabling him to proceed in the fulfillment of his charter contract. But having accepted the service as forced on him, he could have refused to pay for it on the basis of the illegality of the charge. Instead of refusing he ratified his acceptance of the service by giving the draft on his consignee. The duress had ceased before it was given (the alleged duress in giving it being out of the case); and in that state of things the ratification imparted validity to the contract. 6 Wait's Actions and Defences, 660. That it is capable of ratification, because "not strictly void, but only voidable," Ibid, 659. And further, where a contract is merely voidable, a bill or note to pay it is good. Daniel on Neg. Inst., 182.

It follows that the draft is relieved of the objection as to

consideration, and that on the whole the demurrer was properly overruled.

The judgment is affirmed.

MR. JUSTICE RANEY delivered the following dissenting opinion:

Upon the views announced in Ex-parte O'Donovan, *Supra*, 24 Fla., 281; 4 So. Reporter, 789, a County Board of Health has authority to collect fees for inspection and fumigation and disinfection. (Chapter 3443, Act 1883.) This power is not supplanted by the provision of section 6, of the act of 1885, (Chapter 3603,) authorizing the County Commissioners to assess and levy, at the request of the Board of Health, an annual tax, not exceeding two mills on the dollar, "to enable" the Board of Health "to defray the expenses of its operation;" such provision is about the same in effect and purpose as to a county board as the one of Chapter 3443, that "all the officers and employees in and about quarantine shall be paid, and the expenses of the quarantine board, by the city or town establishing such quarantine," is as to a town board.

The fee for cleansing or fumigation, as fixed by the 15th rule of the Board of Health, is "five cents *per ton;*" and if, upon the authorities cited in the opinion of the court in this case, and as held in such opinion, it is a tonnage *tax*, and in violation of section 3, of Article I, Constitution of the United States, which provides that "no State shall, without the consent of Congress, lay any duty of tonnage," the fee for such services should be prescribed in a different form or measure. There seems to me to be ground in the case of Morgan vs. Louisiana, 118 U. S., 455, for doubting its being such a "duty" or "tax" not suggested by the

other cases. I understand this case to hold that it is a compensation for a service, and not a tax.

My understanding of the 14th rule, set out in the opinion of the majority of the court, is that the charge authorized by it, as an independent charge for the use of the " crib," and not as a part of the fumigation or disinfection or cleansing service performed by the board, and for which the fumigation fee is a compensation under rule 15 and chapter 3443, of the acts of 1883. The plea does not show that it was part of a fumigation service or charge in the case before us. It is true that it may be usually necessary to take out a vessel's ballast to fumigate, disinfect or cleanse her effectually. The crib charge is not for the service by the board of taking it out for such purpose. It is a separate charge by the board for the privilege of the vessel's discharging her ballast in the crib. Neither the statute of 1883, nor that of 1885, nor that of 1879, authorize the Board of Health to keep a crib and charge the vessel for its use as a mere place for depositing its ballast, as rule 14 proposes to do. If they are authorized to keep a crib for this purpose, it should be maintained by means of the tax authorized by section 6 of the act of 1885. This charge is, under the rule and statute, as I understand them, illegal.

These boards of health have no right to make or collect a charge which the law of their being does not authorize them to impose. It is shown by the pleading that the service of fumigating and the use of the crib were *in invitum* in so far as the vessel was concerned, and being both this, and illegal as I am clear that charge for use of the crib was, I think that, at least to the extent of such illegality, the judgment is erroneous.