BLUE STAR S. S. CO. v. KEYSER et al.

(District Court, N. D. Florida. May 28, 1897.)

1. CHARTER PARTIES—ADVANCEMENTS FOR DISBURSEMENTS—"CURRENT RATE OF EXCHANGE."

Where a charter party provides for the advancement of ordinary disbursements by charterers to master at "current rate of exchange," held, the expression "current rate of exchange" is one that is unambiguous, that custom of the port cannot be shown to vary the legal meaning, and that the expression necessarily means the amount of premium which it will cost to replace a sum of money in one country in the other, or which a right to a sum of money in one country will produce in another.

2. SAME—POWERS OF MASTER.

Held, that a charter party is a contract between the owners of the vessel and the charterers which the master of the vessel cannot vary, or bind the owners by acts unauthorized by its terms, as between the charterers and owners; and that the expressions in the charter party in controversy are clear and definite, and constitute a positive contract, and the master has no authority to vary its terms, to the detriment of the owners.

3. SAME—COMMISSIONS.

Address commissions are not included in the expression, "in charter party cash advanced for ship's disbursements," and therefore is to be excluded from the amount upon which they charge commission.

On Final Hearing on Libel and Answer.

Convers & Kirlin, Liddon & Eagan, and B. C. Tunison, for libelant.

John C. Avery, for respondents.

SWAYNE, District Judge. The respondents chartered the steamship Blue Star from the libelant corporation, and thereupon said

steamship proceeded to Pensacola, Fla., and was loaded by respondents with a cargo of timber for ports in England. Among the provisions of the charter party were the following:

"(7) Sufficient cash for ship's ordinary disbursements at port of loading to be advanced the master by charterers or their agents, at current rate of exchange, subject to 2½ per cent. commission; master to give his draft at 30 days' sight on owners to cover same, which owners agree to accept on presentation, and to protect, ship lost or not lost."

"(17) The vessel to be consigned to the charterers or their agents at port of loading, paying them 2½ per cent. address commission on amount of freight earned.

"(18) Merchant to do the stowing of the cargo, supply dogs and chains, pay wharfage, customhouse, tonnage, quarantine dues (but excluding fumigating expenses, should such be incurred), and consulate fees for entrance and clearance, harbor master's fees, harbor movements after vessel in loading berth, and pilotage in and out, at two ($2) per load of fifty cubic feet on the entire cargo taken aboard at port of loading."

The charterers presented to the master for his signature a draft upon the libelant for £1,440. 13. 4, the amount of which was determined by a bill rendered the master of said vessel for items of disbursements, amounting to the sum of $6,346.61, a copy of which was attached to the libel, and admitted to be correct in the answer. The draft, as presented by respondents, was signed by the master, indorsed to other parties by respondents, and in the course of business presented and paid by libelant. The libelant in this case contends that the draft was excessive; that the said sum of $6,346.61, which, at exchange of $4.83, alleged to be the "current rate of exchange," would equal £1,314, and 2½ per cent. address commission on £4,074 added, being £101. 7. 0, would make a total of £1,415. 7. 0, the amount the draft should have been. The charterers, to make up the amount of the draft, added a charge of 2½ per cent. upon the address commission of £101. 7. 0, reckoned at the rate of exchange of $4.75, being $12.10, and a commission of 2½ per cent. on $24.35, which was not advanced, and arose from error, amounting to $.61, and that they reckoned exchange at $4.75, instead of $4.83. The respondents contend that the current rate of exchange contemplated and intended by the parties to said charter party at the making thereof was the rate of $4.75 per pound sterling; that the address commission of 2½ per cent. on amount of freight earned was payable to respondents at the port of loading, and was paid by including the same in the master's draft upon libelant as a disbursement of the ship at the port of loading, and that they were legally entitled to said commission. It is sufficiently admitted in the answer to the libel and the answer to the interrogatories propounded in the libel that sterling was convertible into American money at $4.83 to the pound, but the answer sets up a custom of the merchants in Pensacola in dealing with foreign shipowners, who did all of the timber and lumber business in Pensacola, existing for more than 20 years, for the "current rate of exchange" to be regarded as the rate of exchange at which such drafts were currently taken by charterers of such vessels under such charters at Pensacola, and that the rate of $4.75 was such at the time of the presentation of this draft, and that the expression "at current rate of exchange" found in said charter

party has never been regarded in the trade as meaning a premium of discount for replacing a sum of money at Pensacola by an equal sum in the country of the owner of the vessels, or vice versa; that these drafts have no market in Pensacola, but are sent on for collection.

The questions presented on argument were:

First. Has this court, as a court of admiralty, jurisdiction? This action is brought to recover from respondents a sum of money demanded and paid to the respondents from the master of the steamship of the libelant. It is alleged that under the terms of the charter party the respondents had no right to the money so paid by it. It is peculiarly within the jurisdiction of a court of admiralty to determine the essential questions herein involved,—i. e. the rights of the respective parties under the charter party,—and between the respective parties to such instrument a court of admiralty has jurisdiction to determine all the obligations arising therefrom. The A. M. Bliss, 1 Fed. Cas. 593; Church v. Shelton, 5 Fed. Cas. 674; The Queen of the Pacific, 61 Fed. 217, etc.

Second. As to the construction and application of the expression in the charter party, "current rate of exchange." Respondents' theory of construction seems to be that the expression is ambiguous, and that custom may be admitted to explain its meaning. The only bearing the alleged custom may have upon an express provision in a contract is to explain the meaning of words which the parties have used, where the words themselves are ambiguous, and where the court must resort for a legal construction to the surroundings of the parties, or gain their intent from business usages. Where they are customarily considered, in a certain trade, to have a particular meaning, and the parties are shown to know or be in such position that they are presumed to know of the meaning which the custom attaches, evidence of the custom may be admitted, but only for the purpose of showing what the parties did actually intend. The rights of the parties are governed by the contract, and the question is, simply, what is the intent of the parties as expressed in the contract, under the rules of legal interpretation? Where words are popularly used in one sense, and it is claimed that the custom of a trade imposes on them a different meaning, the main question is always this: Can it be said that both parties have used these words in this sense, and that each party had reason to believe that the other party so understood them? Mr. Parsons, in his work on Contracts, fully discusses this proposition on page 542. The question, then, is, can the expression in the charter party, "current rate of exchange," be considered as ambiguous, allowing usage or custom to control the courts in any particular locality as to its meaning? The object of a draft or bill of exchange is the transfer of money from one country to another, and the rate of exchange is the rate at which this can be done, or the price which a right to the payment of a pound sterling in England will command in dollars in America. That rate varies from time to time, and the object of using the word "current," meaning "now passing, present in its course, as the current month or year," and "exchange," the rate at which the pecuniary transfer of funds can be made, can, in my opinion, have no legal ambiguity.

The very name of the instrument by which this amount was collected indicates the office which it so frequently performs,—that of exchanging a debt in one place or country for a debt in another place or country; and the phrase "current rate of exchange" can have but one legal meaning,—the difference in value, at any particular time, of the same amount of money in different countries or places. Daniel, Neg. Inst. § 1440a. This is precisely the meaning which the respondents contend the phrase does not bear, but contend that it means a rate which does not fluctuate; that is, a nominal or customary par. The par of exchange is the value of money of one country in that of another, and may be either real or nominal. Nominal par is that which has been fixed by law or custom, and, for the sake of uniformity, is not altered, the rate of exchange alone fluctuating. Bouv. Law Dict. "Exchange." And it has been held that an instrument containing a promise to pay a certain sum, "current rate of exchange" to be added, was not negotiable, because not definite in amount. Bank v. Newkirk, 2 Miles, 442, 443. The averment in the answer that there is no market for these drafts drawn by the master to his own order, and indorsed to the charterers as payment of disbursements, etc., and that they are sent on for collection, itself destroys the contention of respondents regarding the construction of this phrase. Obviously, no remittance of specie is made from England, but the bills, while still the property of the respondents, are negotiated somewhere in America, and the rate which the merchant realizes on them is greater than $4.75, and is the current rate of exchange at the time. If this is all that the merchant realized on them, it should have been so alleged, and there would have been objection to their reckoning exchange at that rate.

In the answer to the third interrogatory, respondents admit that sterling was then and there convertible into American money at $4.83 to the pound, and therefore, if they had deposited said drafts for collection, they would have realized $4.83 per pound. If the drafts are drawn at $4.75, the shipowners have to pay, not only commissions on disbursements, of 2½ per cent., but an additional amount in excess of the sum actually disbursed, which there is no reason they should pay or should agree to pay. If we can derive a known legal meaning from the expression "current rate of exchange," parol evidence that the parties intended to use it in some different or popular sense will be rejected, unless these words, if interpreted according to their strict legal sense or acceptation, be wholly insensible with reference either to the context of the charter party or the extrinsic facts. Tayl. Ev. § 1165, citing other authorities; Barnard v. Kellogg, 10 Wall. 383. Proctors for libelant have cited many cases bearing on this question, which fully sustain this position. Proctors for libelant further contend in brief that a custom of a particular place only, as it seems from allegations in answer, this to be, cannot be imported into a contract not made at that place, the charter party in this case having been entered into in Liverpool, England; and that the clause referring and including custom of port of loading applies only to matters where the charter party is not express in its provisions; that the provisions relating to commissions and exchange are express, and therefore local custom cannot be imported into it.

Respondents maintain that the charter party expressly provides that this custom is a part of the contract, because the general law makes such custom a part of the contract, under the circumstances stated in the answer; and that the shipowners are presumed to know it, and to have had it in mind when they chartered their ship. But this contention cannot be maintained on the grounds set forth previously. The cases cited in support of same cannot be applied to the circumstances in this case. Although the owners knew of the usage, its character is such that it would not be binding upon one who attempts to resist it; and therefore, even if the parties knew that the usage had long and uniformly existed, such usage could not produce a custom binding upon one who chose to object to it. The provisions in the charter party that the custom of the port shall be valid unless specifically expressed, has no other effect than to put the parties in the same position as if they knew of the usage which prevailed at Pensacola. If they had known of the usage, it is not to be presumed that they intended to adopt it if unreasonable. Usage is not custom, but merely the evidence from which the existence of a custom may be inferred. An unreasonable usage does not establish a binding custom, and the adoption in the charter party of customs at Pensacola brings into the contract only those usages which would have been included had the contract been made at Pensacola, and with knowledge of the usage. It does not make a custom that which is not a custom.

In concluding this phase of the case, I may add that the term "current rate of exchange" can have but one legal signification, and that an unambiguous one,—the rate of exchange is the rate at which drafts are negotiated. It is the amount in dollars for which a draft for sterling will sell per pound. The purpose of the agreement is to fix what amount the master's draft shall be. It provides that it shall be a draft for the number of pounds which will sell for the number of dollars which have been advanced, and thus reimburse the charterers. The answer says that all charters at Pensacola contain the same provision, and that the manner in which they fix the amount of the master's draft is by saying that they shall be drawn at the rate at which they shall be drawn. Such an interpretation seems not consistent with law, because the rate of exchange is not the rate at which drafts are drawn, but the rate at which they are sold; and because it does not fix the amount of the draft, but leaves it subject to any variation which charterers may see fit to make, and would allow merchants in Pensacola to combine and fix arbitrarily the rate or "current rate of exchange" without relation to that which exchange could be procured upon the market. If, on the other hand, the rate meant the rate at which 30-day bills sell, there can be only one such rate intended,—the rate for marketable paper.

Regarding the question whether the charterers had a right to charge libelant a commission upon the commission on freight earned, allowed as address commission, that is a payment by the owner to the charterer for attending to the business of the ship, and provided for in another part of the charter party. I take the view that this was a special compensation to the charterers for managing the business of the ship, and clearly could not be classed among the items provided for in the charter party as disbursements of the ship under

the clause, "in charter party cash advanced for ship's disbursements." Respondents contend that this was payable to them at the port of loading, and was paid by the master's draft, the same as any other disbursement; and set up a custom in said port to that effect. But I cannot reconcile this contention with the facts as pleaded, and regard this commission in the light of compensation, rather than disbursement.

This brings me to a consideration of the last question urged by respondents as defeating the claim of libelant, viz. that the master was well advised of each and every item in the said account at the time that he gave the said draft, and well understood the rate of exchange at which it was given, and gave the same without protest, objection, or dispute at the port of loading. To support this, respondents have cited 4 Wait, Act. & Def. 476, 477, and Ferrari v. Board of Health, 24 Fla. 390, 5 South. 1. This decision is entitled to great consideration, and if I found it applicable to this case I would give it great weight in the disposition of this question. But in this case a draft had been given to the plaintiffs by the master of the vessel for quarantine dues, alleged to be illegal, but which the court held legal, and the owner refused to accept, and this action was brought against the drawer for the amount of the bill. The master interposed a defense of illegality of consideration, and among the questions decided by the court was that it was made without duress, etc., and no doubt this would hold as between the drawer and indorsee for value and without notice, or even under the circumstances of this case; but as between the acceptor and an indorser with full notice of all the circumstances, as in this case, the rule is different. Where knowledge of the defect on the part of the warrantor can be shown, the bill may be returned as worthless, or it may be accepted for the honor of subsequent indorsers, and rely upon the warranty of the indorser, and, on being obliged to pay money or suffer loss, to hold the warrantor liable for damages incurred. See Norton, Bills & N. p. 144. They are entitled, and indeed obliged, to pay this bill, under their promise in the charter party to protect and pay such drafts as should be drawn; and the drawing itself was a request for payment, made by the drawer to the drawee, which drawee it entitled to accept without prejudice to its rights. Daniel, Neg. Inst. § 1256. But, independent of this consideration, since there is no question of bona fide purchaser, we have the consideration of the question regarding the act of the master in drawing this bill for a larger sum than that to which the respondents were entitled under the charter party, and which was done at the request of respondents. In Gracie v. Palmer, 8 Wheat. 639, it was held that it was not in the power of the master to release the charterer from his contract to the owner, so long as the contract is in force, and has no power to modify the terms, since all the power delegated to him while the charter party is in force is to perform the undertaking of his employer in the fulfillment of the contract. It seems clear that the libelant had a right to accept the bill so drawn, and in fact it was his duty, and thereafter look to the respondents for any excess they may have induced the master to include. A decree may be entered for the amounts claimed in the libel.