MACY et al. v. PERRY.

FRIVOLD v. SAME.

(District Court, S. D. New York. December 28, 1898.)

1. CHARTER PARTY—"CURRENT RATE OF EXCHANGE ON LONDON"—ADVANCES—SIXTY DAYS' "USANCE"—BURDEN OF PROOF.

Upon a charter party calling for advances by the charterer to the master at the time of loading in New York of one-half the charter hire "at the current rate of exchange on London," it appearing that there were three different rates of exchange, namely, (a) on cable transfers, (b) on sight drafts, and (c) on 60-day sight drafts, *held* that by long commercial usage 60 days has been the current "usance" between London and New York, and that this usance is implied in the expression "current rate of exchange on London," where nothing else is said; no different usage having become established. The burden of proof is upon the party alleging a change in a long-established usage.

2. SAME—STEVEDORE'S CUSTOMARY RATES.

A provision in a charter party that the "customary rates" should be paid for stevedoring, and the evidence showing that there were no established customary rates for the goods and voyage in question; *held*, that a reasonable compensation only should be charged.

3. SAME—SCREWING COTTON.

Cotton in bales being screwed down in the hold for the purpose only of enabling the charterer to carry a greater quantity of goods, the expense of screwing must be paid for by the charterer, in the absence of any clause in the charter party requiring that expense to be borne by the ship.

In Admiralty.

Convers & Kirlin, for libelants.

Butler, Notman, Joline & Mynderse and F. M. Brown, for respondent.

BROWN, District Judge. In the autumn of 1897 the respondent chartered from the above libelants respectively, the steamships Benalder and St. Andrews to carry a full cargo of general merchandise from New York to ports in China and Japan, for the lump sum of £8,500 sterling for the Benalder, and £9,000 for the St. Andrews. The steamers were loaded and cleared respectively in December, 1897, and January, 1898. Most of the freight due under the bills of lading was collected by the charterers in advance at New York. Both charters required a settlement to be made by the charterers with the captain before the vessel sailed. In the case of the Benalder two-thirds of the charter hire, and in the case of the St. Andrews one-half of the charter hire, was required to be "advanced to the master at the current rate of exchange on London," subject to a charge of 3 per cent. and the remainder paid "on unloading and true delivery of the cargo at ports of discharge in cash, or in short sight bills on London at current rate of exchange, without credit or discount." A subsequent clause required:

"Any difference between the charter party and bills of lading to be settled before vessel's departure from New York. If in captain's favor, by cash less

insurance; if in charterer's favor, by captain's draft on his consignees payable ten days after arrival of vessel at final port of discharge; charterers to have option of appointment of tally clerks, also the stevedore to load and store the cargo under the master's supervision, steamer paying expense of same at customary rates."

As only a comparatively small· amount of freight remained to be collected by the master under the bills of lading at the ports of discharge, a large balance was due to the master for the charter-hire at the time of sailing. In the settlement then made, or attempted to be made, differences on several points arose, which are the subjects of the above suits, namely: (1) The rate at which the advances to the master (two-thirds and one-half the charter-hire for the vessels respectively) were to be estimated in sterling "at current rate of exchange on London"; (2) the rate at which the payment of the cash balance due the master on settlement, was to be estimated in sterling; (3) the rate of deductions for insurance; (4) the "customary rates" or charges for stevedoring; (5) the charge, if any, for screwing cotton in loading ship.

### 1 and 2. Current Rate of Exchange on London.

The evidence shows that there are now in use three principal forms of exchange on London, all current and all differing in rate; viz. (a) the rate on cable transfers, which is the highest rate; (b) the rate on sight drafts, which is somewhat less; and (c) the rate on 60-day sight drafts, which is considerably less than the latter. The respondent claims a conversion of dollars into sterling at the 60-day sight rate upon all their payments of money to the captain, i. e. at the rate of about $4.81$\frac{1}{3}$ to the pound for the Benalder, and $4.82$\frac{1}{3}$ for the St. Andrews,—the current 60-day rate at the date of settlement. The libelants claim that all should be settled at the sight or demand rate of $4.84$\frac{1}{2}$.

The evidence on this subject leaves no doubt that a debt for a given number of pounds sterling payable in New York in cash, without any other stipulation, requires by mercantile usage payment in dollars at the sight rate of exchange, at least, and possibly at the cable rate. These in the present case are very near the par of exchange, that is, the value of the American gold dollar in sterling (49$\frac{1}{2}$d.) without reference to trade conditions, or $4.84 $^6/_7$ to the pound sterling. This rate must, therefore, be applied to the "balance" which was payable to the master in the settlement required to be made "in cash" before the ship sailed. For this cash amount in pounds sterling the master was entitled to the commercial equivalent in American dollars, without reference to any actual exchange on London. Such being in law the express contract of the latter clause of the charter, no habit, usage or practice of the respondent to pay less upon such settlements, nor previous instances of settlements at a less rate, nor of concessions by shipowners can be admitted, because contrary to the plain and unambiguous language of the charter. Steamship Co. v. Keyser, 81 Fed. 507.

The "advances" of two-thirds and one-half of the charter hire, are I think subject to a different rule. Although the advances were in legal effect required to be made in money in New York and for the

ship's use, the rate at which those advances in American money were to be estimated in sterling is qualified by the stipulation that they should be advanced "at the current rate of exchange on London." The only means of actual exchange on London is by drafts or bills payable in London. But it was not meant by this clause that the master should take a transfer of funds in London, or that he should take any draft on London, whether at sight or at 60-days sight; because he was to have American money for use here. It was not intended that there should be any foreign exchange bought or sold in fact; and the phrase is used for no other purpose than to state the rate at which American dollars, as respects such advances, were to be computed in sterling; and that rate is the current rate at which actual exchange on London was bought and sold at the time of settlement.

Until the recent introduction of electricity as a means of making cable transfers, exchange on London consisted, as I have said, of drafts or bills; and by the long-established commercial usage, bills or drafts in exchange on London were always at 60-days sight unless otherwise specified. That was the ordinary form in which exchange on London was bought and sold. Between London and New York 60-days sight was the established usance. Bills drawn "at usance," i. e. the customary time allowed for payment after presentment, meant payable 60 days after sight. The price of exchange on London, or what is the same thing, the rate of exchange on London, is therefore the rate at which customary bills on London are bought and sold; and so long as the customary exchange is at 60-days sight, and bills at usance or at 60-days sight are understood in the absence of other instructions, the 60-day rate must be assumed. The customary usance of 60 days as between London and New York, is laid down in all the authoritative commercial works. It is recognized by the secretary of the treasury, as applied to exchange, in a table quoted in McCullough's Commercial Dictionary giving the New York rate of exchange on London for a long series of years, and stating that the rate given by the secretary in these tables is the rate for 60-day bills: evidently because 60-day bills were the ordinary form of exchange on London.

Much of the respondent's testimony is to the same effect, and that the current rate of exchange on London, when nothing more is said, means the rate for 60-day drafts. The libelants' testimony is mainly based upon the more recent introduction to a considerable extent of exchange on London by drafts payable on demand, or at sight, and also by cable transfers. No doubt if these or either of these forms of exchange have become so established as actually to supersede the use of 60-day drafts, the latter rate could no longer be followed in cases like the present. But the evidence does not warrant such a finding. All are in use, and the daily quotations give the rates for both sight and 60-day drafts. The 60-day draft having been the established customary form of exchange and always implied if nothing was said to the contrary, the burden of proof lies upon the party affirming a change in the old and established custom; that is, upon the libelants. This is all the more reasonable in the case of old instruments like charter parties, where the clauses used are in the old

forms, and where the meaning to be given to particular clauses ought to continue the same, except upon clear proof that they are now used in a different sense than formerly. In this point of view the testimony as to the prevailing practice in settlements under these clauses in charter parties, is competent and material; and as respects the practice in actual settlements the weight of testimony is with the respondent, that is, that no positive change is established. The libelants' contention has but partial support, showing only some variations in actual transactions in charter parties; and their evidence mostly relates to mercantile transactions in exchanges, in which definite instructions it appears are now generally given, so that questions like the present rarely arise. The failure of the ship's agents with whom the settlements in the present cases were made, to appear as witnesses, warrants the inference that their extensive experience does not confirm the libelants' contention.

I find, therefore, that the advance freight should be computed at the 60-day rate of exchange; and the settlement of the remaining balances at the actual mercantile equivalent, or at the sight rate.

### 3. Insurance.

The testimony on this head is very discordant; that of Mr. Barber and Mr. Hunter, from the extent of their transactions, seems to be entitled to the weightiest consideration. There is nevertheless some difference in the testimony of these witnesses as to the proper charge for insurance, especially where the port of Tanghu is included, as was the case with the St. Andrews. As respects the final balance due to the master on settlement, the clause of the charter party is explicit that insurance must be deducted. It must, therefore, be allowed to the respondent. The fact that the charterers did not insure most of the freight, but collected it mostly in advance, is immaterial. The equivalent of insurance was presumably allowed to the shipper in consideration of his payment in advance. The ship, however, would earn no freight unless she accomplished the voyage; and on payment of the freight to her in advance there is not only no injustice, but as it seems to me there is evident justice in the requirement that the ship should allow to the charterer what it would actually have cost the ship to insure it if not paid in advance. I allow, therefore, a deduction of 1 per cent. for insurance upon the balance paid to the master of the Benalder in the final settlement, exclusive of the "advance"; and 1½ per cent. on the St. Andrew's final settlement, in consideration of her touching at Tanghu.

### 4. Stevedoring.

The ship was required to pay the "expense of stevedoring at the customary rates." The proof shows that there was no customary rate, so that a reasonable charge only was payable. See Lowry v. Shipping Co., 84 Fed. 685. I find upon the evidence that a reasonable rate for this stevedoring was 20 cents per bale for loading and stowing cotton; 40 cents per ton for measurement cargo, for pig iron and ordinary machinery; 50 cents for iron rails and $1 per ton for machinery over two tons. The charter of the Benalder provided that

the "expense of loading heavy weights over three tons should be borne by the charterers." I think this clause relieves the Benalder from any charge for loading articles that exceeded three tons in weight; that it is not limited to the excess over three tons. The charter of the St. Andrews contained no similar clause. She will, therefore, pay for articles over two tons at the rate of $1 a ton.

### 5. Screwing Cotton.

No clause in the charter party required this expense to be borne by the ship. It was not necessary to the loading of the ship, and is not by any general custom a charge against the ship. It was work done for the benefit of the charterer, in order to enable him to economize space, so as to load the ship down to her weight limit, or as near thereto as possible. This charge against the ship should, therefore, be disallowed.

Decrees may be entered for the libelants for amounts to be adjusted in accordance with the above findings with costs.