# SUPREME COURT,

## TERM AT JACKSONVILLE,

## EASTERN DIVISION.

---

HEIRS OF JACOB BRYAN VS. DENNIS, MARY, AND OTHERS.

In the construction or interpretation of a statute, all laws in *pari materia*, should be considered in order to ascertain the will of the Legislature; for that which is within the intention of the makers of the law, is as much within the statute as if it was in the letter.

Laws which have reference to the public welfare or the policy of a State, should be construed liberally.

The policy of this State is, and ever has been, opposed to the settlement of free negroes within her borders, and consequently to the unrestricted manumission of slaves.

The Act of 1829, which gives the right to manumit slaves, provides, at the same time, a remedy for the evil, by requiring the owner, after the act of manumission, to transport them beyond the limits of the State. The design of the Legislature manifestly was, that this restriction should apply in the case of a manumission of slaves born in the State, as well as to slaves brought here from other States.

The repealing section of the Act of 1842, is in relation to " Free Negroes and Free Mulattoes," and does not, in any wise, affect the Act of 1829, in reference to slaves.

The Act of 1829, imposes a penalty upon the person who shall manumit any slaves brought into this State, of $200 for every slave so manumitted; and provides that, *before* the grant of manumission, he shall enter into bond for their transportation beyond the limits of the State.

A deed of manumission, made by a person who has not complied with the conditions of the Act, is absolutely void; the title to the slaves remains unaffected, and descends to his heirs.

This was a proceeding instituted by the appellants in the Circuit Court of Duval County, before the Honorable Thomas Douglas, Judge of the Eastern Circuit, to test the

right of the appellees to their freedom, under a deed purporting to be a deed of manumission executed by Jacob Bryan in his life time, and bearing date the 25th November, 1842.

The nature of the proceeding, and the facts of the case, are stated in the opinion of the Court.

*Sanderson*, for appellants, contended :

I. The act of 1829, Thomp. Dig. page 533, must be *strictly* complied with, or the slaves attempted to be manumitted under it, take nothing, and "*shall not be deemed free.*" The appellees claim to be free under and by virtue of the deed of manumission, introduced in evidence. That deed must be shown to have been executed in strict conformity with the requirement of that act, and the *onus probandi* rests with the appellees, as well in this Court as in the Court below.

The statute of 1829 requires, "that such person or persons shall, before he grants such manumission, give *bond* with two or more securities," &c.

The record shows, and the facts agreed upon and submitted admit, that no such bond was ever executed as required by the above cited act. The giving and filing of the bond was a condition precedent, required by said act, and must have been *strictly* complied with, or the deed is void, and the slaves attempted to be manumitted "shall not be deemed free." This principle is recognized and established in the case of Henry Miller, Adm'r., vs. Herbert & Herbert, 5 Howard, 72 ; and when "a statute limits a thing to be done in a particular form, it includes in itself a negation, viz : that it shall not be done otherwise." Plowd. 206*b*. Also, in Bazzi vs. Rose & Child, cited in Wheeler on Slavery, 307, and Mary vs. Morris, Wheeler, 311. If, then, the deed is not such a deed as is required and con-

templated by the act, the affirmative of the propositions of appellants necessarily results.

II. The act of 1829 prescribes the manner in which slaves brought into the State after its passage, may be manumitted, and imposes a penalty for a violation of its provisions. If a statute inflicts a penalty for doing an act, the penalty implies a prohibition, and the act is unlawful. 1 Kent, 467. 5 Barn. & Ald. 335. Dwarris on Statutes, 667–680.

This deed, not having been executed in terms of the act, is *void*, and nothing was granted by it: the title to the negroes remained in Jacob Bryan, the grantor, until the State enforced her right under the statute. The State having released this right to the heirs of Bryan, the title, upon his death, vested in claimants.

III. The act of 1829 applies to the *descendants* of such as are brought into the State after its passage, as well as to the ancestors so brought in. *Partus sequitur ventrem* obtains. Butler & Boarman, Wheeler 21. Timms & Potter, Wheeler 24. The rule of the civil law, Wood's Civil Law, 114, is of force in this State.

IV. The policy of the State is against manumission, and requires a strict enforcement of this act, and embraces alike within its provisions the issue as well as the ancestor.

That the policy of the State is to prohibit emancipation, and the consequent increase of a free negro population, is evidenced by the Constitution and several acts of the General Assembly. In the act of 1829, " prescribing the terms of manumission in certain cases ;" the act of 10th February, 1832, Thomp. Dig. 534, " prohibiting the migration of free persons of color into the State ;" and again in the 16th Article of the Constitution, Section 1st, the State has declared her will. She has there clearly indicated and prescribed such to be her policy, and it is unquestionably the

duty of this Court to *determine* and *carry into effect* that policy by its judgment. And this Court will, in giving a construction to the act of 1829, consider its policy, and give it such an interpretation as may appear best calculated to advance its object by effectuating the design of the Legislature.

*Livingston*, with whom also was *Frazier*, for appellees, contended that the judgment of the Court below, refusing the order for the sale of Dennis and Mary, and declaring them free, was a proper one for the reasons—

I. That they were duly emancipated by their former master, Jacob Bryan, deceased, by deed dated 25th November, 1842, which was recorded on the same day, according to law.

II. If this act of manumission was contrary to the provisions of the act of 1829, it only created a forfeiture to the State of Florida, who could proceed against them in a manner prescribed by the statute, but which right or remedy cannot be assigned or *released* to the present parties, to enable them to proceed as they have attempted in this suit.

The act of 1850, (Pamphlet Laws, 174,) confers no right or interest on the petitioners, because the only word of conveyance used in said act is *release*, which is a technical term, and has a well known and certain definite meaning at common law.

If terms of art are used in a statute, they are to be taken in their technical sense; and if a statute make use of a word, the meaning of which is well understood, and has a certain definite sense at common law, the word shall be expounded and received in the same sense, in which it is understood at common law. See Dwarris on Statutes, 44, 48. 1 Kent Com. 465.

The State of Florida could make no *release* of *property* in the defendants to the petitioners, because—

I. The petitioners were not in possession, nor had any kind of interest or estate in said negroes or mulattoes at the time of the release. See 4 Cruise Dig. 84, 85, 86, 88. Bouvier Law Dictionary, Title Release, and Tomlin's Law Dictionary, Title Release.

1I. Because there was no *privity* between the releasor and the releasee. See 4 Cruise Dig. 87, 89, 90, and Tomlin's Law Dictionary, Title Release.

This statute transfers no right of action to the petitioners, because the right of the State is a mere " chose in action," which is not transferable by release, and can only be released to the persons against whom the remedy existed. 4 Cruise Dig. 88. Tomlin, Title Release.

The act of 1829, entitled, " An Act to prevent the manumission of slaves, in certain cases, in this State," is a penal statute, and should be construed liberally in favor of defendants, and strictly against them. See Daggett vs. the State, 8 Wheeler's Am. Com. Law, 139. Rex vs. Powell, 4 T. Rep. 472. Dwarris on Statutes, 736, 737, 749, 770.

This statute is an innovation upon the common law, and must be construed strictly, and not extended further than the case absolutely requires. See Dwarris on Statutes, 695, 729 ; 1 P. Williams R. 252, and 1 Kent's Com. 464.

Jacob Bryan, deceased, had a right at common law, to emancipate defendants. Wheeler on Slavery, 297, 301.

The act of 1829 is merely directory, and not mandatory, and the authorities of the State may proceed against persons manumitted under it, or not, at their discretion.

The defendants, Dennis and Mary, were born in the State of Florida, and not having been brought into the State since the passage of the act of 1829, are not subject to the penalties imposed by the act.

The act of 1829 was repealed by the 9th section of an act entitled, "An act to prevent the future migration of free negroes or mulattoes in this Territory, and for other purposes," approved 5th March, 1842, and was not in force at the time of the making of this deed of manumission. See pamphlet Laws 1842, p. 34.

SEMMES, *Justice*, delivered the opinion of the Court.

The proceedings in this cause, somewhat informal and novel in their character, were commenced by petition in Chancery, before the Judge of the Circuit Court of Duval County, for the recovery of certain negroes, alleged to have been the property of one Jacob Bryan, in his life time, and which the appellants claim, as his heirs at law.

Under the prayer of the petition, process was issued by the Court below against these negroes, and three of them, Dennis, Mary and Sarah, the defendants in this proceeding, were taken into custody by the Sheriff of the County. These defendants afterwards appeared, by counsel, and filed to said petition their plea, and upon the issue of *liber vel non*, the cause was set for hearing. At the December term, 1851, of said Court, a jury being waived, the case was submitted to the Judge, who thereupon decreed that the said Dennis and Mary were free and entitled to their discharge, and that the said Sarah was a slave, and as such to be sold, and the proceeds deposited in the registry of the Court. From that portion of the decree liberating Dennis and Mary, an appeal was taken to this Court.

The facts of the case, so far as they are material to the present investigation, are the following: In the month of January, 1830, Jacob Bryan, a resident of the State of Georgia, removed to Florida, bringing with him certain negro slaves, among whom were Sarah and Susan, the mother of Dennis and Mary, who were subsequently born in this State.

Heirs of Bryan *vs.* Dennis, *et al.*—Opinion of Court.

On the 25th of November, 1842, Jacob Bryan executed an instrument in writing, purporting to be a deed of manumission, which, by its terms, emancipated and set free the defendants, by name, as well as other negroes mentioned, in said petition. It is in proof that Bryan never gave bond, as required by law, for the transportation of these negroes beyond the limits of Florida, and that they continued to reside here until after the death of Bryan, which took place in 1847, he dying intestate.

The main question arising under the issue upon these facts, is, whether the deed of manumission, by virtue of which these negroes claim their freedom, is valid under the laws of this State?

The act of the Legislature upon the subject of manumitting slaves, passed November, 1829, declares that any person who shall manumit any slaves brought into this State (Territory,) after the passage of the act, shall forfeit and pay for every slave so manumitted the sum of two hundred dollars, and that any person bringing into the State any slaves after the passage of the act, and wishing to manumit them, such person, before he grants such manumission, shall give bond, with two or more securities, in a sum equal to the value of such slaves, to be approved by the Judge of Probate, conditioned for the transportation of such slaves beyond the jurisdiction of said State, within thirty days after such manumission. It is further declared by the statute, that any slave manumitted contrary to its provisions, " shall not be deemed free," but shall be liable to be taken up, under an order of the Circuit Court, and sold by the Sheriff at public sale, and the proceeds paid into the Treasury of the State. No proceedings were ever taken under this statute against these negroes, in behalf of the State; but on the contrary, the Legislature, in 1850, passed a special act for the relief of the appellants, as the

22

heirs of Jacob Bryan, releasing to them all the right, title and interest of the State of Florida in and to said negro slaves.

It is insisted by counsel for defendants that the act of 1829, above referred to, was not in force at the time the deed of manumission was executed, being repealed by the latter clause of the act of 1842, and that consequently the said Bryan had, as at common law, the unrestricted right of manumitting his slaves. Whatever may have been the effect of a repeal of this statute upon the common law right of a master in this State to free his slave, it is unnecessary for us to determine. It is a sufficient answer to the position taken by counsel to say, that the repealing section of the act of 1842 is restricted to laws in relation to " free negroes and free mulattoes ;" the act of 1829 is in reference to slaves. True, it provides for their manumission, upon certain conditions, but this does not bring it within either the spirit or letter of the repealing clause, because it is manifest that before the slave can become a " free negro," and consequently be embraced within the terms of the repealing act, the conditions to his freedom imposed by the act of 1829, must be fully complied with. The act of 1842 was designed to amend the law, as it then stood, in relation to the migration of " free negroes and free mulattoes" to the Territory, and hence the propriety of the repealing clause in reference to laws on the same subject. A fair construction of the act of 1842 would not extend its operation beyond this.

It is further contended by counsel that two of these negroes (Dennis and Mary) having been born in this State, are not comprehended in the statute, although they are the descendants of slave Susan, who was brought into the Territory in 1830. This construction of the act, however plausible it may be considered, cannot be sustained. That

these two negroes are not within the letter of the law, is conceded, but *non constat*, they are not within its policy and spirit.  By reference to the well settled rules of law in the construction of statutes, and in view of the policy of this State in regard to the manumission of slaves, it will become manifest that the interpretation we have given this act is sound and legitimate.  In the construction of a statute, all laws in *pari materia* should be considered in order to ascertain the will of the Legislature; for that which is within the intention of the makers of the law, is as much within the statute as if in the letter; and the intention of the Legislature may often be collected from the cause or necessity of enacting the law.

Hence the proposition is indisputable, that a statute often times comprehends within its spirit a case not within its letter, because it is within the mischief for which a remedy is provided.  And to the same effect, whatever is within the equity of a statute should be considered a part of it, though to effect this it may become necessary to enlarge or restrain particular words.  It is held by all legal writers that laws which have reference to the public welfare, or the policy of a State, should be construed liberally, and with a view to carry out, as far as practicable, the design of the law; and although the natural import of the words used in a statute is to be considered as expressing the intention of the Legislature, yet where such import is repugnant to the principles of national policy, it is the duty of the Court to enlarge or restrain the words, by such construction as will repress the mischief and advance the remedy.  See 7 Mass. Rep., 523.

As to the policy of this State in reference to free negroes, it is well defined and well settled.  From her early history as a Territory, she has been opposed to the settlement of this class of persons within her borders, and as a conse-

quence, to the unrestricted right of her citizens to manumit their slaves. The repeated action of the Legislature in reference to this subject, is a sufficient indication of public sentiment and the policy of the State. The conviction upon the public mind is settled and unalterable as to the evil necessarily attendant upon this class of population, and although treated by our laws humanely, they have ever been regarded with a distrust bordering on apprehension—a class of people who are neither freemen nor slaves, their presence at all times deleterious and often dangerous to the public welfare. In 1832, the Legislature of the then Territory were compelled to enact the most stringent laws to arrest the evil, by prohibiting the further migration of free negroes within her limits; and the emphatic language of the Constitution of the State, depriving the Legislature of the power of passing laws for the manumission of slaves, was but carrying out the principles of that policy settled upon by the previous Legislation of the country. By the act of 1829, the Territorial Legislature, in giving the right to emancipate slaves, provided at the same time a remedy for the evil necessarily growing out of an unrestricted exercise of the right, by compelling the owner forthwith to transport them beyond the limits of the State. If we construe this law so as to restrict its application to slaves brought into the State, and not include their descendants within its provisions, we at once lose sight of the whole policy of the law, and entail upon the State an evil of the most dangerous character, and which it is manifest it was the design of the Legislature to suppress.

The act of 1829 being, in our opinion, in force at the time the deed of manumission was executed, and its provisions embracing all the negroes mentioned in said petition, was the act of manumission contemplated by the grantor consummated by the deed? Or had the deed at

its execution any vitality? It is not pretended that the grantor ever gave bond, as required by the first section of the act. The bond is a condition precedent to the act of manumission, and without it the deed has no legal existence, and consequently is inoperative in vesting in the contemplated beneficiaries any rights whatsoever.

But it is said that though the State may have claimed a forfeiture of this property, yet the deed is good as against the grantor and his heirs, and that the latter are estopped, by the act of their ancestor, from asserting any property in these slaves. The law is otherwise. The deed, upon its execution, was absolutely void, for all purposes—a mere gratuity, made in contravention of law, and imposing no disabilities on the grantor over this property, further than it remained in his possession, *liable* to the claim of the State. Though the statute contains no prohibitory clause, yet it inflicts a penalty, and every contract having the subject matter for its consideration or object, is invalid. 4 Serg. & R., 159. Formerly it was held that unless the statute contained a prohibitory clause, the contract was not void. But in the more recent case of Bartlett vs. Vinor, Holt, C. J., held, that every contract made for or about any matter or thing which is prohibited and made unlawful by any statute, is a void contract, though the statute itself does not mention it shall be so, but only inflicts a penalty; *because a penalty implies* a prohibition, though there are no prohibitory words in the statute. And such is the law as recognized both by the English and American Courts. See 1 Binn., 118, 4 Dall., 269, 10 Bing., 107, 5 B. & Ald., 335.

Independent of this, the statute itself expressly declares that all slaves manumitted contrary to its provisions, shall not be deemed free—terms emphatic and comprehensive enough to dispel all doubts as to the condition of these ne-

groes. The deed being void, the title to the slaves remained unaffected. It continued in Bryan during his life, and descended to his heirs on his death. The title did. not, as contended by counsel, at any time vest in the State, but remained undisturbed in Bryan, subject to be divested by the State upon seizure and sale.

It is true, on the execution of the deed, the State had an inchoate right to the property, under the statute, to be consummated or relinquished at her pleasure. The act of 1850 is a full relinquishment and renunciation of this right, in favor of the heirs of Bryan. A general release or relinquishment, upon the part of the State, of her claim, would have enured to the benefit of these heirs, the title being in them.

Before the passage of this act for their relief, the appellants had the right to reduce this property to possession, and since its passage, their right of possession and right of property is paramount and complete. And we do not understand the necessity that existed of instituting the proceedings in this case in their behalf, or of invoking in any way the action of the Circuit Court in asserting their rights over this property.