FRANKLIN PIERCE McCALL v. STATE.

185 So. 608.

Division A.

Opinion Filed January 3, 1939.

Rehearing Denied January 24, 1939.

*C. A. Avriett* and *E. C. Rutledge,* for Plaintiff in Error;

*Georga Couper Gibbs,* Attorney General, *Lawrence A. Truett* and *Tyrus A. Norwood,* Assistant Attorneys General, and *G. A. Worley,* State Attorney, for the State.

BUFORD, J.—The writ of error brings for review judgment of conviction and sentence to death on a plea of guilty to an indictment charging the offense of kidnaping to hold for ransom, under the provisions of Chapters 16063, Acts' of 1933.

The plaintiff in error has suggested eleven (11) questions for our consideration. They may be reduced to two questions because the first to the sixth questions, inclusive, and the 10th and 11th questions present the contention that under the provisions of our statute a plea of guilty in a case of this sort can not be tendered and accepted but that one accused of violating the provisions of Chapter 16063, *supra,* can only be convicted on trial by a jury.

Questions 7, 8 and 9 challenge the action of the court in accepting a plea of guilty from the insolvent accused before the appointment of counsel to represent him, although counsel was appointed before trial and had the opportunity to make any motions which he might have desired to make and presented no motions to the court.

The transcript of the record here does not comply with the rules of this Court. There was no motion for new

trial in the lower court, no exceptions taken during the proceedings in the lower court and no bill of exceptions presented or settled. Therefore, all of the transcript except the transcript of the record proper could be properly stricken, but the State, through the Attorney General, has waived all irregularities, that the case might be presented in its most favorable aspect to the plaintiff in error.

The case has been submitted on briefs and on oral argument by counsel in behalf of plaintiff in error and by the Attorney General and the State Attorney of the Circuit in which the prosecution was had. It has been stated by the representatives of the office of the Attorney General, and admitted by counsel for plaintiff in error at the bar of the court, that the accused was indicted by the Grand Jury of Dade County, Florida, on the 14th day of June, 1938, for violating the provisions of Chapter 16063, Acts of 1933, and also indicted for the murder of the child whom he was alleged to have kidnaped; that on the same day the accused, McCall, was brought into court and arraigned on the two indictments; that he entered his plea of guilty to the indictment charging the offense of kidnaping to hold for ransom and entered his plea of not guilty to the indictment charging murder in the first degree; that the case was tentatively set for trial on the following day and that the trial Judge then appointed Honorable Jack Kehoe, an able and highly respected member of the Bar who has had much experience in court trials of criminal cases, to represent the accused; that the family of accused on the same day employed Honorable C. A. Avriett to represent the accused; that Mr. Avriett proceeded to Miami and conferred with Mr. Kehoe before the case was called for trial; that on the 15th of June the Honorable H. F. Atkinson, Judge, presiding in the Circuit Court, called the case for trial and asked if counsel were ready for trial; that Mr. Kehoe announced, "The de-

fendant is ready for trial," and that Judge Atkinson then asked if he had any motions to present and Mr. Kehoe answered in the negative. Thereupon the trial proceeded, the defendant being present in person and by his counsel.

The transcript shows that when the State had finished putting on its testimony in chief, the following occurred:

"FRANKLIN PIERCE McCALL, the defendant herein, was called to the stand on his own behalf, and having been first duly sworn, was examined and testified as follows:

"DIRECT EXAMINATION '

"Q. (By Mr. Kehoe) Will you state your name to the Court?

"A. Franklin Pierce McCall.

"Q. And state your age.

"A. Twenty-one.

"Q. Where were you born?

"A. Jasper, Florida.

"Q. How long have you lived in Dade County?

"A. Since 1934.

"Q. The indictment that was read to you in this Court yesterday, charging you with the offense of kidnaping—to that indictment you entered your plea of guilty; is that correct?

"A. Yes, sir.

"Q. And do you now reaffirm that to be your plea to the indictment?

"A. Yes, sir."

Thereupon the accused identified the ransom notes which he was alleged to have written and conveyed to Mr. Cash, the father of the kidnaped child. He told where he left each of the notes. Then the pertinent part of his testimony was as follows:

"Q. Now how far is it from your home to the Cash home—what is the distance?

"A. About a quarter of a mile.

"Q. All right, sir. Go ahead.

"A. I asked what time it was, and I thought it was Mrs. Cash that said it was 9:30; it was time I was home in bed. I turned out of the store and into the alley-way between the store and the filling station, and came to the back screen door. It was locked. I didn't know it would be locked at the time I went there, but it was, I cut the screen with my knife; the knife that was in Court this morning.

"Q. I hand you state's Exhibit 12 and ask you is that the knife?

"A. That is it.

"Q. All right. Go ahead.

"A. I had two large white pocket handkerchiefs with me, and I took these out of my pocket as I came into the back hall, and went on up the hall to the left into the door of Mr. and Mrs. Cash's apartment. The door coming in from the rear opens to the bedroom. I picked Skeegie up in my right arm and placed—

"Q. Now, that is James Bailey Cash, Jr., you refer to:

"A. Yes, sir. Placed the two large white clean handkerchiefs over his face.

"Q. Now just a moment there. Explain how you picked him up. Illustrate with your arms, how you held him.

"A. In my right arm.

"Q. How did you hold him, around the body or under the arm?

"A. Around the body.

"Q. Did you hold him up to you?

"A. Yes, sir.

"Q. Just held him up about this way?

"A.   Yes sir.

"Q.   All right.

"A.   Went out the back door, and he appeared to be sleeping, and just as you pick one out of the car or something, and he is asleep, and carry him in and put him to bed. As I got out the back door, I carried him in both arms and held the handkerchiefs over his mouth—I guess over his nose.   Then I didn't know it.   I walked across Coconut Palm Drive and in through the woods to my house.   It was dark there and I came in through the back door into the bedroom, and placed Skeegie on the bed and shook him to wake him up; called his name and he didn't answer.   I tried— then I knew something was the matter with him.   I knew he was unconscious.   I tried artificial respiration.   I had heard of people that was unconscious could be brought back to consciousness that way, I tried this and I run to the frigidaire, and got some cold water that was there, with a towel, and bathed his face and hands with the cold water, and he still didn't wake up, and I knew he was dead.

"The Court:   That was a wet towel?

"The witness:   Yes, sir.

"Q.   (By Mr. Kehoe)   Now, from the time you went into the Cash residence to the time you got to your home and applied this artificial respiration, did young Cash make any outcry?

"A.   No; I thought he was asleep.   He didn't struggle or move at all.

"Q.   All right.   Go ahead.

"A.   And I saw that he was dead.   I didn't know what to do.   Didn't know where to go or anything.   I picked him up in my arms and started out the back door, running across the woods.   When I started I didn't have any particular place to go in mind.   I went straight from the

rear of my house across the woods, crossed Bayview Drive, and on down to the thick place where he was found.

"Q. How far was that thick place where he was found from your home?

"A. Not a quarter of a mile, I don't believe.

"Q. Not a quarter of a mile?

"A. Not over that.

"Q. All· right. Go ahead.

"A. I placed him in the position, in which he was found, his arms aside of his body by the pine tree that was. there. Came back home. I didn't hardly know what to do. I walked down to John's house and left the first note. From there I came back to the house.

"Q. Now, when did you get the first note of your house?

"A. After I came back.

"Q. After you had taken the body to the place where it was found you went back to your house?

"A. Yes, sir.

"Q. Then got the note?

"A. Yes, sir.

"Q. All right. Go ahead.

"A. Came back to my house and printed the second note, which was the first note that was found. I walked to R. A. Cash's house, about 50 yards from my house, and placed it in the handle of the front screen door. Then came back home.

"Q. Now, what time was that, if you know?

"A. I don't know. It was all hazy. Then in a few minutes, very few minutes, a stream of cars came south on Tallahassee Road going to John Emanuel's house, and in a very few minutes they came back going north to Princeton. I had slipped off my boots before this at home. I pulled them back on and started towards Princeton, and stopped at R. A. Cash's house just long enough to see the son's car

was not there, and then walked on towards Princeton. I had not gone very far before I met the cars coming back. Ishmal was in the lead. He picked me up. We went back down with the rest of the crowd to John Emanuel's house, where the note was found. It was the second note found, but the first one that was written. The note could not be read very well with the car light, so it was suggested that they go back to Princeton and read it at the station there. This was done, and after several had gone into the filling station, the office of the filling station, to read this note, someone, I don't remember who, came out and said that the note had been disciphered and the best thing to do was for everybody to go home. Ishmal and I rode through the Redlands, different roads, I don't remember which ones, until around three in the morning. We came back to Howard McLauglin's house, and I spent the rest of the night there. Is that as far as you want me to go?

"Q. Then what did you do the following day? That would be Sunday—during the day time.

"A. Sunday I had dinner at my father-in-law's and spent the rest of the afternoon around Princeton. Sunday night I was with Donald Cooper.

"Q. And Monday, during the day time, what did you do?

"A. I thought that I flew with Ishmal Cash that afternoon, but I think in the statement that he gave the F. B. I. he said that was Tuesday, Monday, I don't remember.

"Q. Now, the third note that was found, which has been introduced as State's Exhibit 7 and 8, what time of the night did you place those at the Cash Filling station?

"A. Between 12:30 and 1 o'clock.

"Q. At night?

"A. Yes, sir.

"Q. Now, prior to the time of placing that note, did you see Mr. J. B. Cash, Sr.?

"A. I had seen him at 12 o'clock when he left on the first trip.

"Q. And how soon after you saw him leave did you place this third note, State's Exhibit 7 and 8?

"A. I don't remember whether it was placed just prior —1 think it was—to his leaving.

"Q. Just prior to his leaving on this first attempt to make contact?

"A. It was placed, I believe, before 12 o'clock.

"Q. What were you doing at the time that he went out on this first trip?

"A. I was at Smitty's barbecue stand, talking to Robert Smith—Smitty's brother.

"Q. Now, tell about the things leading up to the placing of this note and how you placed that.

"A. Sometime Monday, I had printed the third note, and had it in my watch pocket, and Monday night, right after 11 o'clock I was at Howard McLaughlin's house. I printed the note on the brown paper then from the scratch pad, and Harry and I had gone over to the station to call up Shorty Cash, and when we came back outside, that is when the note was pushed under the door.

"Q. Explain how you got the note under the door.

"A. We were both sitting outside the station door; very dark. The note was placed in the crack under the door and I pushed it under with my comb.

"Q. And who was with you at that time?

"A. Harry Wright.

"Q. Now, what did you do after placing this note under the door?

"A. We went to Smitty's.

"Q. That is the — —

"A. Barbecue stand.

"Q. Barbecue stand. That is you and Harry Wright?

"A. Yes.

"Q. And how long did you stay there?

"A. I don't remember.

"Q. Now, did you see Mr. Cash, Senior, return from this trip?

"A. We saw him return, but we had already found the note and were in George Cooper's car when he returned.

"Q. Explain the manner in which the note, third note, was found.

"A. Went over to the station to get three gallons of gas; pickup truck. Harry and I went in the station first to turn on the power for the pumps and the lights inside. The door was open just enough to let us go in single file. After we put the gas in and went back into the station to turn off the power to the pumps, the door was swung wide open, and the note came clear of the bottom of the door and I picked it up.

"Q. Did you at that time show the note and look at it and read the note with this Harry Wright?

"A. Yes, sir.

"Q. Then what did you do with reference to the note?

"A. He called Ormond Cash at Homestead and told him if any of the fellows that were down there on stands to have them come up there at once, and Shorty came up followed by George Cooper in his car. We all got in George's car and went down Coconut Palm Drive, that rock road that turns north off Coconut Palm Drive, and we all read the note and came back to Princeton. As we were coming into Princeton we met Bailey going north on the Federal Highway. Turned around and chased him about a quarter

of a mile and blinked the lights and caught up with him and gave him the note.

"Q. Do you know of your own knowledge what he did with the note?

"A. No, sir.

"Q. Were you questioned by anyone in reference to that note in Princeton?

"A. Two Federal Bureau of Investigation men questioned both Harry and myself after we came back to Princeton.

"Q. And that was after you had given it to Bailey Cash, Senior?

"A. That is right.

"Q. Now, approximately what time was it that you caught up with Mr. Cash, Senior, and gave him this third note?

"A. Between 12:30 and 1 o'clock, I think.

"Q. Between 12:30 and 1. Then what did you do from one o'clock until four o'clock?

"A. At 2:30 I left Princeton in the pickup ahead of Donald Cooper and Harold McLaughlin. They were following in Harold's Plymouth. They passed me around the Log Cabin on the Federal Highway.

"I returned to my father-in-law's house and woke him up and told him about finding the note, and I believe at that time asked him did he want to go out to Krome Avenue. There was several different groups of cars at different sections of the country down there, hidden, that were taking license tag numbers and watching for any suspicious movements; and I believe at that time I asked him did he want to go on such a stand with me.

"Q. And then explain what you did later in the evening that night.

"A. That was around 3 o'clock. I stayed in the pickup

truck that was parked in his driveway for a few minutes. I don't know how long, and went east on Sunset Drive to the grove in front of John Chamber's place, went into this grove for 50 yards or more and then east again towards Tallahassee Road. At about the third or fourth row of trees then and three or four rows back I stopped and waited.

"Q. What were you waiting for?

"A. Mr. Cash.

"Q. Did you see him coming?

"A. I saw him coming but I didn't know it was him until he was almost by, and I flashed the light twice.

"Q. How did you recognize him?

"A. When he came even with me I recognized him then.

"Q. Did you recognize him or his car?

"A. His car, not him.

"Q. Upon recognizing him, what did you do?

"A. Flashed the light twice.

"Q. Is that the flashlight that has been offered here in evidence? You saw it this morning.

"A. Yes.

"Q. And what did Mr. Cash do?

"A. Stopped and got out, went in front of his car, threw the money that was in the shoebox down at the base of a telephone pole that was at the corner of John William Campbell's property.

"Q. And that was approximately at four o'clock Tuesday morning?

"A. As near as I could tell. I didn't have a watch.

"Q. And how far were you from Mr. Cash when he placed the money in the box there at this place you speak of?

"A. Around 30 yards or further.

"Q. Did you speak to Mr. Cash?

"A. No, sir.

"Q. Speak any word to him?

"A.  No, sir.

"Q.  Did he speak any word to you?

"A.  No sir.  No words were spoken.

"Q.  Was there any message passed between you other than the flashing of your flashlight?

"A.  No, sir.

"Q.  Did he blink the light on his car, give any signal of that sort?

"A.  I don't think he did.

"Q.  After he placed the money in the place that you speak of he got back in his car and drove off?

"A.  Yes, sir.

"Q.  Then what did you do?

"A.  I walked up where he placed the money, picked up the shoebox, turned around and went back into the grove the same route I had taken coming into it.

"About the center of the grove I opened the box, the shoebox, took the money out of the newspaper in which it was wrapped.  I took the first stack of bills, which were five-dollar bills, off the stack, and in doing so the band was broken and I just put the money in a wad in my pocket. Went back through the rear of the grove and came back on Sunset Drive at the same route I had taken going in.  At the corner of Mr. John Chamber's property the rock fence, there was a rock fence, I threw the $9,750 into this corner in the weeds."

Chapter 16063, *supra,* is as follows:

"An Act to Amend Section 5058, Revised General Statutes, Being Section 7160, Compiled General Laws of Florida, 1927, Relating to Kidnapping and Punishment Therefor.

Be It Enacted by the Legislature of the State of Florida:

'Section 1.  That Section 5058 Revised General Statutes being Section 7160 Compiled General Laws of Florida, 1927,

relating to kidnapping and punishment therefor, be and the same is hereby amended to read as follows:

" 'Whoever without lawful authority, forcibly or secretly confines, imprisons, inveigles or kidnaps any person, with intent to hold such person for a ransom to be paid for the release of such person, or any person or persons who aids, abets or in any manner assists such person or persons in such person shall be guilty of kidnapping a person and shall be punished by death unless a majority of the jury shall recommend the defendant to the mercy of the Court, in which event the punishment shall be by imprisonment for life in the State prison.'

Section 1. All laws and parts of laws in conflict herewith are hereby repealed.

Section 3. This Act shall take effect immediately upon becoming a law."

*In pari materia* with this Act must be read and considered sections 6095 R. G. S., 8400 C. G. L. and 6096 R. G. S., 8401 C. G. L. See Heirs of Bryan v. Dennis, *et al.*, 4 Fla. 445; Ferari v. Board of Health, 24 Fla. 390, 5 Sou. 1; Liggett v. Amos, 104 Fla. 690, 141 Sou. 153; Amos v. Conklin, 95 Fla. 206, 126 Sou. 283. The sections involved are as follows:

"8400. Recommendation to Mercy.—In all criminal trials, the jury, in addition to a verdict of guilty of any offense, may recommend the accused to the mercy of the court or to executive clemency, and such recommendation shall not qualify the verdict except in capital cases. In all cases the court shall award the sentence and shall fix the punishment or penalty prescribed by law."

"8401. Same effect in capital cases.—Whoever is convicted of a capital offense and recommended to the mercy of the court by a majority of the jury in their verdict, shall be sentenced to imprisonment for life, and may be sentenced

to solitary confinement at the discretion of the court; or if found by the judge of the court, where there is no jury, to be entitled to a recommendation to mercy, shall be sentenced to imprisonment for life, with or without solitary confinement, at the discretion of the court."

So when the statutory provisions are read and considered *in pari materia* the phrase in Chapter 16063, "unless a majority of the jury shall recommend the defendant to the mercy of the Court, in which event the punishment shall be by imprisonment for life in the State prison," was only a reiteration of the statutory law of this State as it then existed under the sections of prior statutes above quoted.

And so it is that the record shows that when the defendant entered the plea of guilty the Circuit Judge proceeded under the provisions of the statute to determine whether or not the defendant was entitled to recommendation to mercy and, finding from the evidence that he was not so entitled, he sentenced the defendant to be punished by death in the manner provided by the laws of Florida.

Section 3 of the Declaration of Rights of this State provides:

"The right of trial by jury shall be secured to all and remain inviolate forever."

Section 11 of the Declaration of Rights provides:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury."

There can be no doubt that where the statute authorizes the acceptance of a plea of guilty of a capital offense that the accused may waive the constitutional right to trial by jury by a plea of guilty and have the evidence submitted to the trial court to determine the degree of punishment within the statutory limitations to be administered. Sections 6095 and 6096 R. G. S., 8400 and 8401 C. G. L. confer such

power and the provisions of Chapter 16063, *supra,* are not in conflict with, but are in accord with, these sections.

We could cite innumerable authorities to sustain this, enunciation but the highest authority on such questions in this Country is the Supreme Court of the United States and that Court has definitely settled for all time the constitutionality of such statutes. In the case of Hallinger v. Davis, 146 U. S. 314, 36 Law Ed. 986, it was said:

"Hallinger, the appellant, was on the 14th day of April, 1891, indicted by the grand jury of Hudson County, for the murder of one Mary Hallinger. On the 14th day of April, 1891, he pleaded guilty, whereupon the Court ordered the said plea of guilty to be held in abeyance subject to said defendant's consultation with counsel, then assigned for the purpose of consultation concerning such plea. On the 17th day of April, A. D. 1891, the defendant and his counsel again appeared and insisted on said plea of guilty; whereupon the said court continued said assignment of counsel, and ordered said defendant to be present on Tuesday, April 28, 1891, at an examination to determine the degree of guilt under said plea to be then and there had by said court. On the 28th day of April, 1891, the Court, composed of Knapp and Lippincott, Justices, in the presence of the defendant and his counsel heard evidence concerning the degree of defendant's guilt and on the 12th day of May, 1891, the court adjudged the defendant guilty of murder in the first degree and committed him to the custody of the jailor of Hudson County to be confined in the common jail of said county until Tuesday, the 30th day of June, A. D. 1891, on which day he was condemned to be hanged.

"Article 1, Section 7, of the Constitution of the State of New Jersey provides: 'The right of a trial by jury shall remain inviolate, but the Legislature may authorize the trial of civil suits, when the matter in dispute does not exceed

fifty dollars, by a jury of six men.' Section 68 of the Criminal Procedure Act of the State of New Jersey provides: " 'All murder which shall be perpetrated by means of poison or by laying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in perpetrating or in attempting to perpetrate any arson, rape, sodomy, robbery or burglary, shall be deemed murder in the first degree; and all other kinds of murder shall be deemed murder of the second degree; and the jury, before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict whether it be murder of the first or second degree; but if such person shall be convicted on confession in open court, the court shall proceed by examination of witnesses to determine the degree of the crime and give sentence accordingly.' In his said petition the defendant alleged that said Section 68 of the Criminal Procedure Act of New Jersey is in violation of the Constitution of the United States' and of the State of New Jersey, and that his sentence and detention are illegal.' He also states that by virtue of the statutes and laws of the State of New Jersey, no right of appeal in murder cases exists, and he has no right to appeal to any higher court in the state to review or annul said illegal judgment and sentence.

"On the 30th day of May, 1892, this application for a writ of habeas corpus was by the Circuit Court of the United States for the District of New Jersey refused.

"It is contended on behalf of the appellant that the judgment and sentence of the court of oyer and terminer of Hudson County, New Jersey, whereby he is deprived of his liberty and condemned to be hanged are void because the act of criminal procedure of the State of New Jersey in pursuance of the provisions of which such judgment and sentence were rendered, is repugnant to the 14th Amend-

ment of the Constitution of the United States, which is in these words:

" 'Nor shall any State deprive any person of life, liberty or property without due process of law.' Such repugnancy is supposed to be found in the proposition that a verdict by a jury is an essential part in prosecutions for felonies, without which the accused cannot be said to have been condemned by 'due process of law'; and that any act of a state legislature providing for the trial of felonies otherwise than by a common law jury, composed of twelve men, would be unconstitutional and void.

"Upon the question of the right of one charged with crime to waive a trial by jury, and elect to be tried by the court, when there is a positive legislative enactment, giving the right so to do, and conferring power on the court to try the accused in such a case, there are numerous decisions by state courts, upholding the validity of such proceeding. *Dailey* v. *State,* 4 Ohio St. 57; Dillingham v. State, 5 Ohio St. 280; *People* v. *Noll,* 20 Cal. 164; *State* v. *Worden,* 46 Conn. 349; *State* v. *Albee,* 61 N. H. 428.

"If a recorded confession of every material averment of an indictment puts the confessor upon the country, the institution of jury trial and the legal effect and nature of a plea of guilty have been very imperfectly understood, not only by the authors of the Constitution and their successors down to the present time, but also by all the generations of men who have lived under the common law. It is only necessary in order to determine whether the Legislature transcended its power in the act, to require whether it is prohibited by the Constitution. The right of the accused to a trial was not affected and we can, therefore, have no doubt that the proceeding to ascertain the degree of the crime where, in an indictment for murder, the defendant enters a plea of guilty, is constitutional and valid. Statutes

of like or similar import have been enacted in many of the States, and have never been held unconstitutional. On the other hand, they have been repeatedly and uniformly held to be constitutional."

We commend the reading of the opinion in full, with the notes thereto appended, in 36 Law Ed., *supra,* to those interested further in this subject. See also Green v. Commonwealth, 12 Allen (Mass.) 155.

So it is that the questions from 1 to 6, inclusive, and questions 10 and 11 must be answered contrary to the contentions of plaintiff in error.

As has been hereinbefore stated, the record before us, together with the admissions made at the bar of this court by counsel for the respective parties, show that while the defendant was arraigned and pleaded to the indictment before having the advice of counsel, the conclusion is inescapable that the court set the case tentatively for trial to give the defendant opportunity to confer with counsel appointed by the court and that before proceeding with the trial when the defendant was in court accompanied by his counsel, the trial judge gave him every opportunity to present any motion which he might wish to present, which necessarily included a motion to withdraw the plea of guilty and enter a plea of not guilty, and counsel announced to the court that he did not desire to present any motion.

The entire record shows that the plaintiff in error was deprived of no legal right and that after the State had closed its taking of testimony the defendant voluntarily went on the stand as a witness and reaffirmed his plea of guilty and then told in detail of every step which he took in the commission of the crime charged against him.

The defendant in the court below never at any time, either before, during or after the trial, intimated that he wished to withdraw his plea of guilty and enter plea of not

guilty. The only reasonable and logical conclusion is that the defendant, fully realizing his guilt, believed that he would have a better chance to escape death by submitting the evidence to a mature, fair-minded and impartial judge than he would have to submit the evidence to a jury of twelve men drawn from the body of the county and that he deliberately and advisedly exercised that choice.

The record shows beyond and to the exclusion of every reasonable doubt that no extenuating circumstances existed which could in reason commend the defendant to the mercy either of a jury or of a trial judge.

The record fails to show that the constitutional rights of the defendant were violated in any regard and does show that the proceedings and the judgment were in conformity with the law and the facts.

The judgment is, therefore, affirmed.

So ordered.

Affirmed.

TERRELL, C. J., and THOMAS, J., concur.

WHITFIELD, P. J., and BROWN and CHAPMAN, J. J., concur in the opinion and judgment.